OPINION OF THE COURT
Edward J. Greenfield, J.
"Matchmaker, Matchmaker make me a match. Find me a find, catch me a catch. Matchmaker, Matchmaker look through your book and make me a perfect match.” (Fiddler on the Roof.)
In this country, we believe we have progressed well beyond parentally negotiated marriages and the employment of the services of the matchmaker, marriage broker or "shadchen”. Indeed, in New York, and in many States, marriage brokerage contracts have been held void as against public policy. (Duval v Wellman, 124 NY 156; State of New York v Leifer, 89 Misc 2d 724, 726; Annotation, 72 ALR 1113.) Nevertheless, lonely *354 unmarried persons continue to yearn to find their soulmates. They have gone beyond waiting for friends to fix them up, congregating at church socials, participating in community groups or mingling in singles bars (where the consumption of alcohol may be secondary) and flock to dinner clubs, travel groups, singles weekends at resort hotels, and personal ads of greater or lesser originality and candor. The fulfilling of a perceived need inevitably gives rise to commercialization. When various persons and agencies began to provide introductions and matchups between persons of the opposite sex for a fee, many responded, but many of those in the quest became frustrated and disappointed as when some such agencies took undue advantage of the vulnerability of their hope.
In 1971, the Attorney-General of New York backed a new statute to regulate such abuses, explaining: "The Bureau of Consumer Frauds and Protection has received an alarming number of consumer complaints regarding social matching services. Many such services charge as much as $600 for their services. Investigation indicates that this business is fraught with fraud and misrepresentation. Many companies have opened and then quickly closed due to financial difficulties or otherwise after receiving large sums of money from the public. As to companies still in operation consumer complaints fall into general classes: (1) no matches received at all; (2) matches received are totally incompatible.” (Mem of Attorney-General, Feb. 22, 1971, 1971 NY Legis Ann, at 96.)
The New York State Legislature, cognizant of such complaints of abusive conduct and unfulfilled promises, thereupon enacted section 394-c of the General Business Law (eff Sept. 1, 1971). The law places limitations on contracts involving social referral services, limiting the fee that can be charged, requiring that a minimum number of referrals be provided, and calling for the confidentiality of any personal information given.
Plaintiff herein, Great Expectations Creative Management, Inc. (Great Expectations), a videotape dating service, operating successfully in 39 metropolitan areas outside of New York State, is now desirous of commencing operations here, but first seeks a declaratory judgment that its activities would not be subject to General Business Law § 394-c, claiming it does not engage in "social referral services” as defined by the law.
While this may possibly be viewed as an attempt to obtain an advisory opinion (see, Matter of State Indus. *355 Commn., 224 NY 13, 16), it is not unreasonable for a party contemplating certain action to seek a declaration of the court before major expenses are incurred or any actual breach or violation of law has taken place. (New York Pub. Interest Research Group v Carey, 42 NY2d 527, 530; Post v Metropolitan Cas. Ins. Co., 254 NY 541.)
CPLR 3001 authorizes the Supreme Court to render a declaratory judgment "as to the rights and other legal relations of the parties to a justiciable controversy.” Involved here is certainly a real dispute involving substantial legal interests, and not a hypothetical state of facts calling for the intellectual exercise of an advisory opinion. The plaintiff should not be required to expend substantial funds, enter into contracts, acquire facilities, hire employees and do advertising before knowing whether it must conform its activities to a regulatory statute, which it challenges both as to scope and validity. (New York Foreign Trade Zone Operators v State Liq. Auth., 285 NY 272; Hearthstone Ins. Co. v Village of Penn Yan, 53 Misc 2d 359.) When there is a genuine controversy as to disputed jurai relations, a declaratory judgment as to future obligations which would enable parties to avoid loss and injury would be appropriate. (Borg v New York Majestic Corp., 139 NYS2d 72.)
Great Expectations, aptly named because of the flutter of hope and anticipation that must be inherent in all its applicants seeking new acquaintances, claims to service over 120,000 members, with gross revenues in excess of $42,000,000. Members are enrolled by it for fees between $1,100 and $2,400. It claims that more than 12,000 couples have married after using its services. It has earned acclaim and gratitude from many who have subscribed. Great Expectations appears to argue that its mission is to make people happy. If, incidentally, in doing so the company providing the service also makes a profit, all the better. Then, even more people will be happy. However, it asserts, it doesn’t "make matches”. It merely makes information available to its members, who then act on their own initiative. Thus, plaintiff argues, in effect, that it is not doing "matching”, but is enabling its members to exercise self-selection. There is really no dispute about the facts. Hence, plaintiff seeks summary judgment as a matter of law, contending alternatively that the statute does not apply to its operations, that the statute is unconstitutionally vague, and that the regulations imposed constitute unconstitutional price control.
*356 The method by which plaintiff operates is as follows: After having made a decision to join a company-owned or franchised Great Expectations center for a fee (which is greater than that permitted under General Business Law § 394-c), a new member prepares a personal profile and specifies what he or she is looking for in another person. The new member then has photographs taken and further submits to a five-minute videotape interview. The tape is maintained at the center for perusal by other members, who may select up to five videotapes a day to preview. Upon a member making a determination that he or she (the initiating member) wishes to meet a person whose profile, photograph or videotape is of interest, the initiating member then informs the personnel at the center, who in turn contact the desired person (the recipient member) and invite that person to review the initiating member’s profile, photograph and videotape. If at that point the recipient member is interested in meeting the initiating member, Great Expectations sends the name and telephone number of each member to the other, so they can then make contact with each other and presumably arrange to meet. What follows is up to them, but it cannot go forward without Great Expectations as the intermediary.
Whether the described operations of Great Expectations come within the scope of the regulatory statute does not depend upon whether the particular organization has a sterling reputation or is of the fly-by-night variety marked by the type of fraudulent activities which motivated enactment of the law. Rather, the task of the court is to determine whether the statutory language is broad enough to cover plaintiff’s operations, not its character.
The statute, in subdivision (1), defines its scope: "1. As used in this section, the term 'social referral service’ shall include any service for a fee providing matching of members of the opposite sex, by use of computer or any other means, for the purposes of dating and general social contact.” (General Business Law § 394-c [1]).
It is the contention of plaintiff that it does not provide matching, since it allows people to meet each other as a matter of their own volition. In other words, it claims to be merely the facilitator rather than a provider of member-matching services. The claim is that the members, and not the organization, make the match.
The court cannot agree with that position. It is clear *357 that the scope of the statute is not limited to service agencies which actively match individuals, but encompasses those services for a fee "providing matching of members of the opposite sex, by use of computer or any other means.” The plain dictionary definition of the verb "provide” is "to furnish, to supply or to make available.” (American Heritage Dictionary of English Language [3d ed 1992].) "Referral” means "directing to a source for information” or "to direct one’s attention to” (id.). Clearly then, the plain language of the statute is not limited only to services that actually do the matching, but includes those agencies which make available the means for persons to do their own matching. The precise technique is of no moment.
This court agrees with the statutory construction employed by the court in Lewis v People Resources (NYLJ, Mar. 9, 1992, at 31, cols 1, 2 [Sup Ct, NY County, Cohen, J.]): "Based upon the inclusion of the word 'providing’ it does not matter whether defendant actually matches its members. It is sufficient if defendant made available the matching of members * * * or supplied the means for the matching of members. Through its use of autobiographies, photographs and videotapes placed in its profile library where members can review other member’s profiles and extend invitations through defendant, it is clear that defendant is 'providing matching of members.’ ”
Plaintiff takes the position that as a mere facilitator it is not really a "social referral service.” However, when it makes the matching of members available by use of its technological facilities, it is something more than a mere computer "dater bank”. Plaintiff argues that what it does is essentially no different from what is done by publications like New York Magazine, which features personal ads to enable subscribers to meet other individuals, or from the practices of resorts like the Concord Hotel or Club Med which emphasize the availability of their facilities as a gathering place for singles who will sort themselves out. The analogy is misplaced. The primary purpose of a resort hotel is to provide rooms, not roommates, even though, on occasion, to promote the use of its facilities it may encourage single individuals to congregate on a particular occasion. Similarly, a church may hold a social at which single individuals may mingle, but no one would suggest that the church’s primary purpose was to put together single individuals of the opposite sex. The same holds true for personal ads. A magazine or other publication is in the *358 business of selling advertising space, and once paid cares not one whit whether its advertisers succeed in selling a used car or finding a mate. They are not charging a fee for their matching services — like the hotels, they are selling space as a commodity and any matching which occurs is incidental to their primary business.
Plaintiffs contention that the statutory reference to the providing of matching "by use of computer or any other means” could not apply to it because the use of video libraries for social referrals could not have been contemplated in 1971 is specious. The adoption by the Legislature of the language "any other means” clearly contemplated that matching could be made by techniques or technologies which could not then be specified or anticipated. The applications of plaintiffs logic would exclude laser-printed documents from statutes calling for contracts to be "written”, or would require exclusion of airplanes from the sweep of interstate commerce because they were unknown at the time of the adoption of the Constitution. Statutory language must be elastic to cover new devices or techniques which accomplish the same general purpose.
Plaintiffs argument of statutory vagueness also fails. There is no ambiguity as to the described activity of "providing matching of members.” (See, Chassman v People Resources, 151 Misc 2d 525; Lewis v People Resources, supra.) This court concludes that the language of General Business Law § 394-c "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.” (Jordan v De George, 341 US 223, 331-332; see also, Hoffman Estates v Flipside, Hoffman Estates, 455 US 489.)
The contention that the statutory limitation of fees to be charged for social referral services (not more than $250) constitutes unconstitutional price control is without merit. We are not here dealing with a purely private business. The Legislature clearly was concerned with the possibility of unscrupulous services preying upon the general public, and victimizing the gullible, the unwary and the helpless. Thus, we have had not only recognized as constitutionally valid regulation of apartment rents, but in a cognate section of the General Business Law, section 394-b, the statute purported to regulate fees for gymnasiums, dance instruction and other social and training facilities, and the constitutionality of such regulatory control was upheld. (Best v Arthur Murray Town & Country Dance Club, 60 Misc 2d 660.) Plaintiff contends that it would be economically impossible for it to operate with the *359 maximum membership fee limited to $250 — thus effectively barring it from the State. Other such agencies do operate here successfully. As long as the Legislature has chosen a limited degree of regulation as a matter of public policy to guard against abuse and exorbitance, the courts may approve legislative price regulation as a legitimate exercise of the police power. (Cf., Hertz Corp. v Attorney-General of State of N. Y, 136 Misc 2d 420, 428; Gold v DiCarlo, 235 F Supp 817, affd 380 US 520.) General Business Law § 394-c "was enacted in response to wide-spread fraud, misrepresentation and price gouging by social matching services. It reasonably limits the fee to $250, and regulates the terms of contracts for such services and the number of referrals that must be provided.” (People v Helena VIP Personal Introduction Servs., NYLJ, Sept. 26, 1990, at 22, col 2 [Sup Ct, NY County, Wilk, J.], affd 199 AD2d 186 [1993].)
With respect to the motion for summary judgment, the court declares that General Business Law § 394-c would be applicable to plaintiff’s proposed operations, that it is a constitutional exercise of the State’s police power, that it is not vague or ambiguous nor does it constitute unconstitutional price control.