OPINION OF THE COURT
Diane A. Lebedeff, J.
In a case apparently of nationwide first impression, the Attorney-General of this State seeks enforcement of consumer fraud and false advertising laws, against a business physically located within this jurisdiction, upon the allegation that the business engaged in fraudulent and deceptive consumer sales practices targeting the world-wide Internet audience by methods involving the use, misuse and abuse of e-mail.
The legal claims raised have relevance to the development of "Internet law” because the applicable State statutes parallel Federal and other State statutes, as detailed in the legal discussion below.
Background
The underlying sales scheme is simple. Respondent Kevin Lipsitz, using various assumed business names, sells magazine subscriptions from a location in Staten Island, New York. He uses names such as Collegetown Magazine Subscription Services, Krazy Kevin’s Magazine Club, Magazine Club Inquiry Center and Tempting Tear-Outs.
The Attorney-General presents numerous affidavits and complaints, by local residents and individuals from a number of other States and countries, which describe a sorry tale of purchasing magazine subscriptions from respondent’s friendly and congenial staff, followed by one of the following: (1) the magazine(s) never arrived; or (2) if any magazine(s) started to arrive, always after an extremely extended delay, the subscription was shortened, often by as much as half the length of time for which the consumer paid, with the only notice of the actual end date of the subscription being the printing on the magazine’s mailing label.
Requests for refunds are portrayed as receiving the following predictable sequence: (1) assurances that the complaint would *574 be investigated; (2) increasingly surly responses; (3) when the customer became indignant, the customer was told he or she would not receive a refund if the customer was unpleasant; (4) not returning calls or hanging up; and (5) in some documented incidents, acts of retaliation if complaints continued. When consumers complained to the Better Business Bureau or the Attorney-General’s Office, respondent advised the agencies that the problem lay with the publisher and, even after that contact, often still failed to remedy the deficiency.
The thrust of the submissions are that respondent was simply pocketing the subscription money, although, from time to time and on a random basis, he would cause some magazines to be delivered, but never quite enough.
Although the respondent has been engaged in the sale of magazine subscriptions since at least 1986, the deceptive sales practices complained of within these papers began only in the last several years, when advertising began to be distributed by electronic mail, called "e-mail”, on the Internet.[1] Respondent created messages from fictitious satisfied consumers extolling the unbeatably low prices and wonderful customer service provided by respondent. The e-mail messages were chatty and friendly. They were sent to people who were members of particular e-mail discussion groups, which groups are called "listservs” or "lists”. The supposed author was portrayed as a member of the group, which might inspire confidence in the testimonial. The author advised respondent did "virtually no advertising” and "only likes to take new members from referrals from satisfied existing customers.” The fictitious author asked inquirers to mention her name so she would be credited with referrals and concluded the letter with the remark "Once you get in, you’ll love them.” The Attorney-General states it has found no evidence of such any club and states that "[r]epondent will take money from any consumer who sends it.”
Every documented attempt to trace the author of the electronic missives recited in these papers found that the named sending source did not exist. In all instances in which an initiating source could be identified, respondent was found to have been the actual e-mail initiators. Methods are available for sending "anonymous” e-mail, either directly, or by *575 mass e-mailing by a "re-mailer” (Religious Technology Ctr. v Netcom On-Line Communication Servs., 923 F Supp 1231, 1256, n 29 [ND Cal 1995], citing Hardy, The Proper Legal Regime for ”Cyberspace” 55 U Pitt L Rev 993 [1994]).
Although many aspects of the conduct of this advertising campaign are not critical to the Attorney-General’s claim, the campaign is ominously portrayed within the papers as more equivalent to war. Each member of a group — and groups number a hundred persons and up — would receive a several-page testimonial and order form, including reference to obtaining a "juicy” magazine catalogue. This practice of group distribution is called "spamming” and the practice of using a fictitious source is called "spoofing”. The mere receipt of these lengthy e-mails was objectionable, for a recipient may be paying for units of Internet access time while reviewing messages and bulk e-mail is a burden on the finite capacity of receiving computers (see, Cyber Promotions v American Online, 948 F Supp 436, 464 [ED Pa 1996] [limits placed upon advertiser sending unwanted bulk e-mail]).
Several instances are presented in which the membership list was confidential and could have been obtained only by deliberate, unauthorized entry. An elaboration of the nature of such groups appears in Shea v Reno (930 F Supp 916, 927-928 [SD NY 1996]), which describes other features of the Internet, and more specifically addresses restrictions upon access to sexually explicit material.
As to retaliation, when the member of one university group complained to respondent, each member received numerous copies of the communication, such that the receiving computer’s capacity to receive electronic mail was filled and members could no longer receive legitimate educational communications. One group was subjected to this treatment so extensively and repeatedly that the group was terminated as the only effective method of allowing members to escape the unwanted attention.
The respondent’s unsolicited attentions and the antics described above became well known in the Internet community.
Reportedly, respondent was repeatedly ejected from reputable Internet access providers, such as America OnLine, none of which desired to provide a "host” Internet source for a business which was the subject of complaints. A withdrawal of access privileges is a common institutional response to repellent Internet communicators (see, United States v Baker, 890 F *576 Supp 1375, 1391, n 25 [ED Mich 1995] [treating e-mail speech in the same manner as any other form of communication]).
Respondent now operates through an independent Internet "host” source. Fifty disgruntled consumers found their way to the New York State Attorney-General, the Better Business Bureau of Metropolitan New York, Inc., the National Fraud Information Center, and the Telemarketing Fraud Database. The Telemarketing Fraud Database is jointly maintained by the United States Federal Trade Commission and the National Association of Attorneys General. Thereafter, the complaints were collected and the New York State Attorney-General then commenced this action.
Discussion
The Attorney-General requests a variety of relief under New York State’s General Business Law §§ 349 and 350. These sections are based on section 5 of the Federal Trade Commission Act (38 US Stat 717, 15 USC § 45), and, unlike some mail fraud statutes, provide a remedy for fraud targeting consumers (compare, 18 USC § 1341, and Penal Law § 190.60; see generally, Givens, Practice Commentaries, McKinney’s Cons Laws of NY, General Business Law § 349, at 565). New York’s consumer protection laws are similar to consumer fraud, deceptive sales practices and consumer protection laws of other States.[2]
The Attorney-General asks that respondent be enjoined from engaging in the alleged fraudulent, deceptive and illegal practices described in the papers, from doing business within this State absent posting a bond to guarantee payments to consumers, and from destroying business records. Additionally, it is requested that respondent provide a detailed accounting of past transactions, and that the court issue a determination regarding restitution to consumers, impose a civil fine, and *577 enter a money judgment against respondent in favor of the Attorney-General.
This special proceeding is commenced pursuant to Executive Law § 63 (12), which authorizes a special proceeding against a person or business committing repeated or persistent fraudulent or illegal acts.[3] The Attorney-General also claims respondent has engaged in deceptive acts and practices violative of General Business Law § 349, false advertising violative of General Business Law § 350, and the use of unregistered assumed business names violative of General Business Law § 130 (1) (a).
As to the procedural standards to be applied here, this matter is a special proceeding, commenced by a verified petition. The issues raised in the petition are to be summarily determined on the papers "to the extent that no triable issues of fact are raised” (CPLR 409 [b]). The petition is treated in a similar fashion as a motion for summary judgment (compare, special proceeding under CPLR article 78; Matter of Piela v Van Voris, 229 AD2d 94 [3d Dept 1997]).
Jurisdiction
The acts alleged to constitute consumer fraud occurred on the Internet. Respondent urges that the Attorney-General and this court have no jurisdiction over his Internet activity, a position which this court rejects, and presents other arguments which seek to limit the individual complaints to be considered by the court.
The Internet has been well described in several Federal court decisions. "The Internet is not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks. It is thus a network of networks” (American Civ. Liberties Union v Reno, 929 F Supp 824, 830 [ED Pa 1996], probable jurisdiction noted — US —, 117 S Ct 554, 136 L Ed 2d 436). As of 1996, it was estimated that more than 9.4 million computers were so linked, with 40 million people accessing the system, and it was anticipated that there would be 200 million Internet users by 1999 (supra, at 831). Internet "communications can occur almost instantaneously, and can be directed either to specific individuals, to a broader group of people interested in a particular subject, or to the world as a whole” (supra). "Individuals *578 can also access the Internet through commercial and noncommercial 'Internet service providers’ that typically offer modem telephone access to a computer or computer network linked to the Internet” (supra, at 833).
E-mail is "comparable in principle to sending a first class letter” (supra, at 834). Both the sender and the recipient have "an address (rather like a telephone number)” (supra, at 836). Such an e-mail address represents an individual user’s chosen identifying name at a particular computer system, for example, "mailbox-name@ host.com,” with the "host computer providing Internet services ('site’) [having] a unique Internet address * * * which is an alphanumeric 'domain name’ * * * [registered with] the Internet Network Information Center ('Internic’), a collaborative project established by the National Science Foundation” (MTV Networks v Curry, 867 F Supp 202, 203-204, n 2 [SD NY 1994]).
As can be readily envisioned, civil Internet litigation defendants often raise jurisdictional objections and respondent is no exception.. Indeed, although Internet transactions might appear to pose novel jurisdictional issues, traditional jurisdictional standards have proved to be sufficient to resolve all civil Internet jurisdictional issues raised to date, refuting the view of "[s]ome commentators * * * [who] believe a new body of jurisprudence is needed to address” questions of personal jurisdiction and the Internet (Zembek, Jurisdiction and the Internet: Fundamental Fairness in the Networked World of Cyberspace, 6 Alb LJ Sci & Tech 339, 346 [1996]).
The first jurisdictional consideration is whether the litigation target has established a physical presence or a sufficiently close equivalent in the jurisdiction. Such a physical presence is not established, for example, by merely maintaining an Internet site accessible by an individual in a given jurisdiction. As recognized by Magistrate Peck in Hearst Corp. v Goldberger (1997 WL 97097, 1 [SD NY, Feb. 26, 1997]), "a finding of personal jurisdiction in New York based on an Internet web site would mean that there would be nationwide (indeed, worldwide) personal jurisdiction over anyone and everyone who establishes an Internet web site. Such nationwide jurisdiction is not consistent with traditional personal jurisdiction case law nor acceptable to the Court as a matter of policy” (see also, in accord, Bensusan Rest. Corp. v King, 937 F Supp 295 [SD NY 1996, Stein, J.]). However, where a person or business conducts a business within the forum State by being a subscriber to a local Internet service provider and selling a prod- *579 net through that provider, jurisdiction is proper (CompuServe, Inc. v Patterson, 89 F3d 1257 [6th Cir 1996]; see also, as to varying tests for tort and intellectual property claims, EDIAS Software Intl. v Basis Intl. 947 F Supp 413 [D Ariz 1996]; California Software v Reliability Research, 631 F Supp 1356 [D Cal 1986]; Playboy Enters. v Chuckleberry Publ., 939 F Supp 1032 [SD NY 1996]). Here, respondent is physically located within the jurisdiction.
The second jurisdictional consideration is of the acts done by the litigation target within the jurisdiction, which must provide sufficient "minimum contacts” with the forum to meet the constitutional jurisdictional test enunciated in International Shoe Co. v Washington (326 US 310, 316 [1945]). Traditionally, advertising alone is not sufficient presence within a forum to support jurisdiction (see, as a typical example from a legion of cases so holding, Fidelity & Cas. Co. v Philadelphia Resins Corp., 766 F2d 440, 447 [10th Cir 1985], cert denied 474 US 1082 [1986]). The mailing of a letter or making a telephone call to a forum resident, if that act is done outside a jurisdiction, does not alone support jurisdiction in a forum (see, e.g., Bross Utils. Serv. Corp. v Aboubshait, 489 F Supp 1366, 1371-1372 [D Conn, Cabranes, J.] ["The transmission of communications between an out-of-state defendant and a plaintiff within the jurisdiction does not, by itself, constitute the transaction of business in the forum state”], affd 646 F2d 559 [2d Cir 1980]; Reynolds v International Amateur Athletic Fedn., 23 F3d 1110, 1119 [6th Cir], cert denied 513 US 962 [1994]; Nicholas v Buchanan, 806 F2d 305, 307-308 [1st Cir 1986], cert denied 481 US 1071 [1987]; see also, Cendali and Arbogast, Net Use Raises Issues of Jurisdiction, Natl LJ, Oct. 28, 1996, at C7, C9). Here, again, these actions were done within this jurisdiction.
In summary, for Internet consumer fraud claims, the Internet medium is essentially irrelevant, for the focus is primarily upon the location of the messenger and whether the messenger delivered what was purchased. In some cases, it might be necessary to analyze the location of certain other business operations, such as the site used or the place orders were received. Such refinements are unnecessary here for the entire enterprise was firmly based in New York State.
Accordingly, a jurisdictional challenge is rejected as specious because respondent does business in New York State and the acts complained of physically occurred in New York, even though the impact may have been in another location. New York courts have clear jurisdiction over persons actually pres *580 ent in New York and over organizations and corporations doing business in New York " 'with a fair measure of permanence and continuity’ ” (McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C301:2, at 7-9).
Further, there is no reason to exclude consideration of out-of-State complaints, as respondent requests. The Attorney-General has clear authority to seek to restrain illegal business practice by a local business in relation to both in-State and out-of-State residents, notwithstanding that these practices occur on the Internet. The statute imposes no geographical restrictions upon the consumer complaints which properly serve as a basis for an enforcement action by the Attorney-General. As one court has already specifically noted, "the plain meaning of the language * * * indicates that the Legislature intended that all consumers be protected from illegal practices regardless of their residency and that the Attorney-General of this State is mandated to take necessary action * * * to protect all of these consumers” (State of New York v Camera Warehouse, 130 Misc 2d 498, 499 [Sup Ct, Dutchess County 1985, Jiudice, J.]).
Accordingly, the court determines that it shall consider complaints of both residents and nonresidents of this State, a result which is hardly novel given a number of consumer protection statutes have been interpreted as including application to out-of-State customers (see, collecting cases, Edelman, Applicability of Illinois Consumer Fraud Act in Favor of Out-of-State Customers, 8 Loy Consumer L Rep 27 [1995-1996]). Accordingly, all complaints, including those from the residents of Israel and the Virgin Islands, are properly before the court.
Finally, the court holds that it shall consider both sworn and unsworn complaints contained within the papers and rejects respondent’s position that only sworn complaints should be granted credence. First, the Attorney-General’s mandate is sufficiently broad that the Attorney-General could commence enforcement actions even if no complaints were to exist (see, State of New York v Management Transition Resources, 115 Misc 2d 489 [Sup Ct, NY County 1982]). Second, there is specific precedent for the presentation of unsworn complaints (State of New York v Michael Oldsmobile Corp., Sup Ct, NY County, July 2, 1990, index No. 43145/90), although this court views it unlikely that restitution could be granted thereon.
A final inquiry, albeit not one raised by the parties, is whether concepts limiting or invalidating State laws which impermissibly burden interstate commerce should impede the *581 claims raised here. The principles and precedents were recently explored in depth in American Lib. Assn. v Pataki (969 F Supp 160 [1997, Preska, J.]), which concluded that New York Penal Law § 235.21 (3), directed at computer communication system transmission of obscene material, was an unconstitutional violation of the Commerce Clause of the United States Constitution and stated the view that "the Internet is one of those areas of commerce that must be marked off as a national preserve to protect users from inconsistent legislation that, taken to its most extreme, could paralyze development of the Internet altogether” (at 169).
Here at issue are consumer protection laws applicable to the conduct of a local business, which were not designed nor aimed at regulating conduct outside this State’s borders (compare, Baldwin v G.A.F. Seelig, 294 US 511 [1935] [improper attempt to regulate milk prices outside State borders], and Edgar v MITE Corp., 457 US 624 [1982] [regulation of intrastate corporations unquestioned but regulation of interstate out-of-State corporations invalid]), not even indirectly (Pike v Bruce Church, 397 US 137, 142 [1970]). These local consumer fraud laws touch upon no known Federal policy which requires uniformity (Southern Pac. Co. v Arizona, 325 US 761 [1945] [varied State specifications regarding train length invalid]). Finally, these consumer protection statutes are not an attempt to regulate speech on the Internet or create an Internet regulatory scheme (see, for descriptions of such efforts, American Lib. Assn. v Pataki, supra, at 167-168, 177).
To place a realistic context on these matters and leave behind the ratified air of cyberspace, the issues raised here would be the same if each involved a consumer individually sued in the Staten Island Small Claims Part. Each defrauded customer’s complaint would state, "I was robbed of my subscription money”, "failure to deliver as promised,” or "breach of contract.”
The claims are of local concern, as recognized by the nationwide system of State consumer protection laws. There is no compelling reason to find that local legal officials must take a "hands off” approach just because a crook or a con artist is technologically sophisticated enough to sell on the Internet. Invocation of "the Internet” is not the equivalent to a cry of "sanctuary” upon a criminal’s entry into a medieval church. It should be sufficient that the laws sought to be applied, even if they might tangentially implicate interstate commerce, are "media neutral” and otherwise pass constitutional muster. The *582 laws advanced here meet that test, although not every foreseeable statute has or will.
Based upon the foregoing, the court finds that it has jurisdiction over the entire matter and all complaints presented. "
Statutory Violations
As to the actual practices in which respondent engages; the Attorney-General has established that respondent consistently fails to deliver magazines as promised and consistently fails to honor his money back guarantees. The respondent has advanced no evidentiary material to refute the Attorney-General’s assertion as to the nature of respondent’s business practices or, more accurately, business malpractices. Although respondent’s counsel urges that consumers were not "deceived” because they knew they were purchasing magazines, any impartial recipient of the advertising should have been entitled to expect to receive exactly the subscription paid for, with reasonably timely and complete delivery, accompanied by the promised wonderful customer service.
The conduct established by the record proves violations of the New York State consumer fraud statutes. A business practice of failing to deliver as promised is recognized as fraudulent and illegal conduct violating General Business Law § 349 (People v Apple Health & Sports Clubs, 206 AD2d 266 [1st Dept 1994], lv dismissed and lv denied 84 NY2d 1004 [1994] [no health club services]; People v Empyre Inground Pool, 227 AD2d 731 [3d Dept 1996] [no pools]; People v Helena VIP Personal Introductions Servs., NYLJ, Jan. 17, 1992, at 26, col 3 [Sup Ct, NY County], affd 199 AD2d 186 [1st Dept 1993] [no dates]; State of New York v Management Transition Resources, supra [no management services]). Here, the Attorney-General has established that the respondent’s business practice is generally "no magazines, no service, no refunds,” although exactly the contrary is promised, making the sales promises a deceptive and fraudulent practice clearly falling within the consumer fraud statutes.
Additionally, by falsely advertising attentive customer services and disseminating fictitious testimonials, respondent violates General Business Law § 350. Although some of the specific advertising gimmicks — such as the disguised source of e-mail messages to group members and the references to a "club” to which not all would be admitted — were particularly designed to inspire confidence, the mere falsity of the advertising content is sufficient as a basis for the false advertising *583 charge. It would not matter if only the unsophisticated, overly credulous or ignorant .consumer would believe the claims and be misled (People v Volkswagen of Am., 47 AD2d 868 [1st Dept 1975]; Matter of Lefkowitz v E. F. G. Baby Prods., 40 AD2d 364, 368 [3d Dept 1973]).
Finally, by operating under assumed business names without the requisite governmental filing, the individual respondent violates General Business Law § 130 (1) (a), which mandates a filing of an assumed business name certificate with the office of the clerk of the county "in which such business is conducted or transacted [setting forth] the full name or names of the person or persons conducting or transacting the same * * * with the residence of each such person”. The individual respondent has not filed such certificates for either "Krazy Kevin’s Magazine Club” or "Magazine Club Inquiry Center.”
Based upon the foregoing, the Attorney-General has established respondent’s violations of the above laws. In so doing, the Attorney-General has also demonstrated that a consumer fraud action by a State’s Attorney-General against a local offending business is an excellent weapon in the soon-to-be-expected war on Internet fraud. Indeed, Internet users can report consumer fraud to Federal officials and State Attorneys-General on the Internet itself, but, as illustrated here, it is a wise precaution to secure an address for any entity with which one does business.
Remedies
The Attorney-General seeks several different forms of relief.
Injunctive relief is sought pursuant to specific authorizations for such relief under Executive Law § 63 (12) and General Business Law § 349. The requirement of a bond to assure future proper business behavior on the part of an enjoined business traditionally accompanies such an injunction (see, People v Empyre Inground Pool, 227 AD2d 731 [3d Dept 1996], supra; People v Helena VIP Personal Introductions Servs., 199 AD2d 186, supra). The court finds the request for an injunction warranted. The court is unaware of any unspecified but claimed "obvious constitutional reasons” why a bond should not be ordered.
The court will defer the amount of the bond for fixing in the order to be settled hereon. Such bond amount will be subject to adjustment after the completion of the accounting and restitution hearing provided for below, when the court will have further facts before it. Respondent may submit documentary evidence regarding the financial status of respondent in support *584 of any order to be settled and propose an amount for the bond therein. It is noted that the Attorney-General has requested a bond of $100,000.
An order of restitution is authorized by Executive Law § 63 (12) and General Business Law § 349, where, as here, violations of the substantive underlying provisions are found. The fact that respondent has offered to make restitution, but, consistent with the past, has yet failed to do so does not defeat the request for an order of restitution. If respondent provides restitution to any individual prior to an accounting, he will not be ordered to undertake restitution a second time. The mechanism for restitution shall be established in an order to be settled following the accounting ordered herein (see, mechanism for restitution to be provided in order to be settled, People v Helena VIP Personal Introductions Servs., 199 AD2d 186, supra).
The manner of the accounting shall be resolved at the initial preliminary conference to be held in this matter, as will any issues regarding the scope of the accounting, discovery and whether the matter shall be referred to a Special Referee. Respondent is directed not to destroy any business records, which he states he will not do.
The fixing of penalties shall also be deferred until the accounting. Pursuant to General Business Law § 350-d, a penalty of $500 may be fixed for each violation of sections 349 and 350 of the General Business Law and specifically for each improper advertisement and each improper consumer transaction (People v Allied Mktg. Group, 220 AD2d 370 [1st Dept 1995]; People v Helena VIP Personal Introductions Servs., 199 AD2d 186, supra).
Consistent with Executive Law § 63 (12) and CPLR 8303 (a) (6), the Attorney-General is awarded costs of $2,000 against respondent Lipsitz, who is individually liable for the actions conducted under both the registered and unregistered assumed business names.

. The term "e-mail” commonly is used as a noun, verb, and adjective. "E-mail” will be so used within the balance of this decision.
A description of the Internet, which has also been called "cyberspace”, and e-mail appear in the legal discussion below. Because the Internet is comparable to a geographical location, the term is capitalized here.

. See, Annotation, Scope and exemptions of state deceptive trade practice and consumer protection acts, 89 ALR3d 399 (1978 and supp); Karns, State Regulation of Deceptive Trade Practices under "Little FTC Acts”: Should Federal Standards Control?, 94 Dick L Rev 373 (1990) (both analyzing State statutes); see, Annotation, Right to private action under state consumer protection act, 62 ALR3d 169 (1975 and supp) (as to statutes permitting a private right of action); see, Clinton, Do Businesses Have Standing to Sue under State Consumer Fraud Statutes?, 20 S Ill U LJ 385 (1996) (for business claims); see, Miller, Consumer Issues and the Revision of U.C.C. Article 2, 35 Wm & Mary L Rev 1565 (1994) (for status of relevant uniform and model laws); see, Moldovan, New York Creates a Private Right of Action to Combat Consumer Fraud: Caveat Venditor, 48 Brook L Rev 509 (1982) (as to background of the New York statutes).

. "Fraud” is defined as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions” (Executive Law § 63 [12]).