■ LILI GROSSMAN, Appellant, v MATCHNET PLC, Respondent. [782 NYS2d 246]—

Order, Supreme Court, New York County (Charles Edward Ramos, J.), entered April 4, 2003, which granted defendant's motion to dismiss the complaint pursuant to CPLR 3211 (a) (3) and (7), affirmed, with costs.

Plaintiff is without standing to seek relief in this matter pursuant to General Business Law § 349 or General Business Law § 394-c (the Dating Services Law) because, inter alia, she has not sufficiently alleged that she sustained any "actual harm" from defendant's failure to include provisions in its subscription contract provisions mandated by the Dating Services Law. Plaintiff has not alleged that she ever sought to cancel or suspend her subscription with defendant, much less that the rights guaranteed her under the Dating Services Law in the event of cancellation or suspension were actually denied her by defendant in reliance on the allegedly statutorily inconsistent provisions of its subscription contract (*see Small v Lorillard Tobacco Co.*, 94 NY2d 43, 56 [1999]; *and see DeRiso v Synergy*

*USA*, 6 AD3d 152 [2004]). Nor has plaintiff alleged any basis for recovery in quasi contract, since she has not identified any manner in which defendant was unjustly enriched. Plaintiff paid for defendant's services for two months and does not allege that she did not receive the benefit for which she paid. Concur—Buckley, P.J., Mazzarelli and Ellerin, JJ.

Tom and Sullivan, JJ., concur in a separate memorandum by Sullivan, J., as follows: I concur in the majority's decision affirming the dismissal of the complaint pursuant to CPLR 3211 (a) (3) and (7) on the ground that plaintiff has not sufficiently alleged that she sustained any "actual harm" because of defendant's failure to include certain provisions in its subscription contract as required by the Dating Services Act ([DSA] General Business Law § 394-c). I write separately only to express the view that the DSA does not apply to the service contract offered by MatchNet and therefore has no application to plaintiff's claim.

The DSA defines "social referral service" as "any service for a fee providing matching of members of the opposite sex, by use of computer or any other means, for the purpose of dating and general social contact" (General Business Law § 394-c [1] [a]). While the complaint alleges that MatchNet "arrange[es] romantic encounters through the internet" and that it is "a dating service . . . [which] coordinat[es] romantic introductions to members also participating in the service," plaintiff does not allege that MatchNet matches members.

MatchNet, the owner of JDate.com, operates a Web site through which subscribers have the opportunity to seek out and introduce themselves to other JDate subscribers through e-mail correspondence. Although visitors can access a MatchNet Internet site and view one another's profiles and photographs at no cost, only a subscriber, upon payment of the $28.50 one-month subscription fee, may send e-mail correspondence to other subscribers. That correspondence may lead, if the two subscribers agree, to telephone communication or face-to-face meetings.

Thus, whereas a social referral service takes an assertive role in matching single persons with one another, MatchNet merely provides people with the opportunity to seek out and communicate with each other. MatchNet's role is passive, more akin to those who provide personal advertisements, which distinguishes *its* service from one which, as the DSA requires, "provid[es] matching." Thus, plaintiff has not established that the service MatchNet provides comes within the purview of the DSA.

Further proof that the DSA was never intended to apply to MatchNet's Internet service can be gleaned from the legislative history of the DSA's enactment in 1971. The DSA was recommended by the then Attorney General, who determined that there had been an alarming number of consumer complaints regarding social matching services, a business "fraught with fraud and misrepresentation," which, as to some companies, charged as much as $600 for their services (Mem of Atty Gen, 1971 NY Legis Ann, at 96). The consumer complaints fell into two general classes: "(1) no matches received at all; (2) matches received are totally incompatible" (*id.*). Apparently, the operators of such services preyed upon the lonely and rejected members of society (Letter from State Consumer Protection Bd to Counsel to Governor, Bill Jacket, L 1971, ch 559). The harm sought to be prevented was the practice of dating referral services that required their customers to sign long-term contracts involving significant sums of money (*id.*)

It is readily apparent that MatchNet is not engaged in the type of activity that the DSA was intended to regulate. Here, plaintiff paid $28.50 for one month of MatchNet's services on two separate occasions, December 2000 and August 2001. Each time MatchNet, in return, agreed to provide her with one month of access to its worldwide Internet database of personal advertisements. There was no obligation to remain a subscriber for any period of time beyond the one month.

Since the DSA has no application to plaintiff's claims, General Business Law § 349, which, in the circumstances presented, cannot stand on its own, is equally inapplicable.