OPINION OF THE COURT
Diane A. Lebedeff, J.
*619 Two claimants sue to recover, respectively, $1,000 and $3,790 paid under a contract for defendant’s services, which offer to expand a client’s social horizons primarily through posting a client’s video and profile on an Internet site on which other clients can review them and thereafter, as desired, approach a selected client for actual social interaction. Because of the similarities of these two cases, a consolidated decision is issued.[1]
Upon the basis of the contract and testimony, the court determines that the transactions were subject to the Dating Service Law, which regulates defined “social referral services” falling within the scope of General Business Law § 394 (General Business Law § 394-c [1] [a] [“ ‘social referral service’ shall include any service for a fee providing matching of members of the opposite sex, by use of computer or any other means, for the purpose of dating and general social contact”]). In relation to the application of the Dating Service Law, more than a decade ago, it was judicially determined that the law did cover services which match members by creating a location and mechanism for members to assess each other by reviewing another *620 member’s video, photograph and profile — a substantially similar service to the one defined by the written contract terms here 0Great Expectations Creative Mgt. v Attorney-General of State of N.Y., 162 Misc 2d 352, 357 [Sup Ct, NY County 1994, Greenfield, J.] [member profile, photos and video maintained at company’s center for perusal by other members, such services were covered by statute because “it does not matter whether defendant actually matches its members. It is sufficient if defendant made available the matching of members ... or supplied the means for matching the members”] [citations omitted]; accord, Chassman v People Resources, 151 Misc 2d 525, 528 [Civ Ct, NY County 1991, Diamond, J.] [member video and biography kept in a library for access by other members, “the distinction between a service that actually matches people for dating and one that provides the means for the match has no meaning in the context of the clear legislative intent to regulate this kind of activity no matter how it is accomplished or implemented”]).
The mere fact that the basic social introduction process was to be conducted on the Internet in this case does not place the dating service outside the scope of the law. The statute specifically includes services which utilize computers (General Business Law § 394-c [1] [a] [“ ‘social referral service’ shall include any service for a fee providing matching of members ... by use of computer ... for the purpose of dating and general social contact”]). Indeed, in Grossman v MatchNet plc (10 AD3d 577 [1st Dept 2004]), the Appellate Division applied the Dating Service Law to an Internet social referral service with far less expensive services and viewed any distinction regarding the use of the Internet as too insignificant to merit discussion.[2] The use of the Internet creates no exception from the application of consumer protection laws, where there is a New York business and a transaction located in New York (People v Lipsitz, 174 Misc 2d 571, 579 [Sup Ct, NY County 1997, Lebedeff, J.] [for New York “consumer fraud claims, the Internet medium is essentially irrelevant, for the focus is primarily upon the location” of the relevant actor and whether statute violated]).
Because the Dating Service Law is found applicable, the court will review the contract and the service’s operation for compli *621 anee with the statute. Two types of departures are found. First, there was a massive overcharge by the dating service. Where, as here, the dating service does not assure it will furnish a client with a specified number of social referrals per month, the service may charge no more than $25 (General Business Law § 394-c [3] [“Every contract for social referral service which requires payment by the purchaser of such service of a total amount in excess of twenty-five dollars shall provide that the seller of such service must furnish to the purchaser a specified certain number of social referrals per month”]). The subject dating service contracts assured that there would be no referrals and, even as the oral assurances given to claimant Roe of 12 introductions to be provided over the course of 36 months, failed to commit to any number of introductions in any given month. Accordingly, $25 was the maximum lawful charge for each contract.[3]
Second, in both cases, the defendant’s form contract violated every mandate of the Dating Service Law, with the single exception that each contract did contain notice of a three-day “cooling off” right to cancel (General Business Law § 394-c [7] [a]-[d]). The required provisions omitted from the contracts establish a failure to comply with General Business Law § 394-c *622 (3) (contracts above $25 to state “specified certain number of social referrals per month”), subdivision (4) (contracts above $25 to set forth client has “option to cancel the contract and to receive a refund” if minimum referrals not made), subdivision (5) (undertaking service provider will not reveal “any information and material of a personal or private nature” without client’s written consent), subdivision (5-a) (granting client “unilateral right to place his or her membership on hold for a period of up to one year”), subdivision (6) (commitment of return to client of “all information and material of a personal or private nature acquired from a purchaser directly or indirectly including but not limited to answers to tests and questionnaires, photographs or background information ... by certified mail” after conclusion of contract), subdivision (8) (specification of the maximum distance for any face-to-face meeting), and subdivision (8-a) (requirement to set forth a policy to be applied if the client “moves to permanently reside at a location outside the service area”). The posture that defendant’s services were not governed by the law in any respect also is demonstrated by the failure to provide to the clients written notice of the mandatory “Dating Service Consumer Bill of Rights” (General Business Law § 394-c [7] [e] [“In every social referral service sale or renewal, the seller shall provide each purchaser with a clear and conspicuous, separate written notice, to be known as the ‘Dating Service Consumer Bill of Rights’, which shall contain . . . (specified) information,” including notice that if the fee exceeded $25, a minimum number of social referrals must be set out as required by General Business Law § 394-c (3)]).
Turning to the issue of damages, the Dating Service Law states that “[a]ny person who has been injured by reason of a violation of this section may bring ... an action to recover his or her actual damages or fifty dollars whichever is greater” (General Business Law § 394-c [9] [b]). The court is fully satisfied that “actual damages” include the difference between each contract price and the $25 fee which is the maximum fee permitted under the Dating Service Law for these contracts.
Both claimants seek a return of the full balance paid, which raises the question of whether they establish damages justifying a return of the additional $25 each. This court had its opportunity to “view the witnesses, hear the testimony and observe demeanor” (People v Bleakley, 69 NY2d 490, 495 [1987]; see also, Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499 [1983]; Hoover v Durkee, 212 *623 AD2d 839, 841 [3d Dept 1995]). Issues of credibility, as well as the weight to be given to the evidence presented, are primarily questions to be determined by the court in a nonjury trial (People v Coleman, 278 AD2d 891 [4th Dept 2000], lv denied 96 NY2d 798 [2001]; Matter of Caccavale v Brown, 271 AD2d 717, 718 [3d Dept 2000] [“Since the trial court is presented with the unique opportunity to observe the demeanor of the witnesses testifying before it and to assess their credibility . . . deference will be accorded to its findings unless they lack a sound and substantial basis in the record” (citations omitted)]).
In this case, each claimant, both appearing to be intelligent, well-spoken and attractive professional women, carefully negotiated the services to be provided. Defendant had the obligation to assure that each client of the dating service was made aware of the statutory rights by providing each with the “Dating Service Consumer Bill of Rights” (General Business Law § 394-c [7] [e]). Based upon the testimony, the court determines that each claimant would not have signed a contract containing terms violating applicable law, had she known of her rights and, accordingly, each claimant is entitled to a refund of the final $25 balance at issue, which finding achieves substantial justice in these small claims matters (CCA 1805 [a]).
Given the foregoing, it is determined that the claimants are entitled to a full refund as restitutionary damages. The statute’s reference to “actual damages” was added to the Dating Service Law in 1992 (General Business Law § 394-c [9] [b], added by L 1992, ch 348, § 1), and — as a part of the same legislation — newly authorized the Attorney General to bring enforcement actions and to seek civil penalties of up to $1,000 for each violation (General Business Law § 394-c [9] [a]; see, for example, Matter of People v Introductions, Inc., 252 AD2d 631, 632 [3d Dept 1998] [suit against dating service sought restitution for 521 customer complaints in the amount of $204,287.10 and penalties of $150,000]).
Logic indicates that the 1992 amendment “evened the playing field” by offering a single remedy of restitution to a consumer, which could be achieved by the alternate routes of commencing an individual suit or filing a complaint with the Attorney General. It then follows that the Legislature, by adding the “actual damage” language to the statute in 1992 did not erode New York State’s commitment to protect consumers from price gouging by dating services. However, such contracts may no longer simply be set aside as contrary to public policy, as was *624 done in the 1991 decision based upon an earlier version of the Dating Service Law (Chassman v People Resources, supra, 151 Misc 2d at 528 [given the then existing “statute’s silence as to the penalty for noncompliance . . . public policy demands . . . noncomplying contracts be deemed void and unenforceable. If such contracts were to be enforced . . . social referral services would continue to violate the statute with impunity, secure in the knowledge that the only penalty they face will be a reduction in their fee to the statutory limit”]).
Based upon the foregoing, the court awards actual damages of the face amount of the contract to each claimant, with interest to commence on the date of the contract payment. Because claimant Doe’s contract has expired and claimant Roe’s contract is terminated by reason of this determination, defendant may wish to return personal material to each claimant, notwithstanding that such obligation does not appear in this contract (General Business Law § 394 [6], quoted above). A failure to return personal materials could well lead to adverse consequences outside the scope of this litigation.
Finally, the court considers whether it should exercise its judicial discretion to report the activity found to violate applicable law to appropriate governmental authorities, which in this case would be to the New York State Attorney General’s Consumer Fraud Unit, as well as the New York City Department of Consumer Affairs (General Business Law § 394-c [9] [c] [“In cities having a population over one million, the provisions of this section may be enforced concurrently with the attorney general by the director of a local or municipal consumer affairs office”]).
Although “[n]o . . . rule has been adopted as to what is required if a judge receives information indicating that a litigant or witness appears to be guilty of unlawful conduct,” it has been recognized that “as a general rule judges are granted the discretion, under the proper circumstances ... to report instances of illegal conduct revealed in the course of proceedings before the judge” (Advisory Comm on Jud Ethics Op 03-110 [2004]). As to the exercise of such discretion, in a 1988 opinion, the Advisory Committee wrote (1) that the “desirability or appropriateness . . . depends upon all the circumstances, such as the nature of the [offense], the effect of such report on the administration of justice, and, in particular, on the court’s truth determining function, and whether it was revealed by the perpetrator’s voluntary testimony,” (2) that a report could be *625 “undesirable” if it “would dissuade witnesses on trial from telling the whole truth or encourage the threat of possible criminal proceedings as a means of pressure, for settlement purposes or otherwise, by one litigant against another,” and (3) that a judicial decision to report would be proper if the judge concluded “reporting such a revealed [offense] is in the public interest” (Advisory Comm on Jud Ethics Joint Op 88-85, 88-103 [1988]).
The court considers the following factors: (1) that reporting the wrongful activity found impacts upon the public interest, given that the acts violated rules governing a regulated industry and appear to reflect a continuing pattern and practice on the part of the defendant as indicated by, among other things, the use of a printed boiler plate form found not to be in accordance with applicable laws; (2) the court’s past and future truth determining function in each matter has not been, and will not be, impacted by a potential or actual report because no threat of future reporting was posed during the course of these proceedings, and these matters are now disposed; and (3) a question touching upon the administration of justice and the integrity of a court order may be posed in that a similar course of conduct by the same or a related defendant was previously litigated (Great Expectations Creative Mgt. v Attorney-General of State of N.Y., supra). As to the manner of the report, it shall be accomplished by forwarding a copy of this decision to the appropriate public officials.
Prior to the issuance of a judgment, the name of the defendant in each case is amended to reflect that the defendant Great Expectations is also known as GE Management Group of NY, Inc., as indicated in the written contracts.

. The boiler plate printed form contracts have standard terms, reciting that plaintiff would receive a “photo shoot, video, workbook on dating, counseling, background checks, [and] dating etiquette” (para 2 [a]), and that the defendant “will provide zero number of social referrals” and “is not promising to furnish the Member with any social referrals and the Member does not desire or expect the Company to furnish social referrals” (para 6 [capitalization in original contract removed]). The text of the personal shopper membership paragraph does not identify what additional services would be provided nor set forth any assurances regarding introductions (para 2 [a]).
Claimant Doe signed a $1,000 contract for a term of six months. Claimant Roe signed a $3,790 contract for a term of 36 months, which was eventually extended to a total duration of 54 months. Although the printed text of both contracts was identical, Ms. Roe’s contract bears the additional handwritten notations of “Marriage Program” and “Platinum Shopper” which indicated that the program orally assured her she would be introduced to 12 people through the program and, in Ms. Doe’s contract, the personal shopper membership paragraph is stricken. Ms. Roe testified that she was introduced to no prospective suitors and met only one person who approached her after seeing her posted information; Ms. Doe met no one through the service but, at some point, stopped checking with the service to see if any other clients had reached out to her.
For the purposes of this decision, the court has substituted the last names of the claimants with Doe and Roe, respectively. All parties appeared pro se. A corporate defendant may appear through an authorized representative in small claims cases in New York City (CCA 1809 [2] [“A corporation may appear in the defense of any small claim action brought pursuant to this article ... by any authorized officer, director or employee of the corporation provided that the appearance by a non-lawyer on behalf of a corporation shall be deemed to constitute the requisite authority to bind the corporation in a settlement or trial”]).

. In Grossman v MatchNet plc (supra), the majority’s holding that the Supreme Court pleading failed to plead proper damages under the Dating Service Law is not relevant to small claims matters, which is limited to a statement of a cause of action reduced “to a concise, written form” (CCA 1803 [a]).

. The clients’ failure to cancel their contracts is irrelevant where the contract itself does not recite a specific number of social referrals per month. Had the contract set forth a minium number of referrals, the matter might require consideration of General Business Law § 394-c (4), which provides:
“Every contract for social referral service which requires payment by the purchaser of such service of a total amount in excess of twenty-five dollars shall provide that in the event that the seller of such service does not furnish to the purchaser the specified certain number of social referrals for two or more successive months the purchaser shall have the option to cancel the contract and to receive a refund of all monies paid pursuant to the cancelled contract with the exception that the seller shall be entitled to retain as a cancellation fee fifteen per cent of the cash price or a pro rata amount for the number of referrals furnished to the purchaser, whichever is greater. Every such contract shall set forth in the contract and in the bill of rights the manner in which such services provider determines its cancellation fee pursuant to this subdivision.”
Upon any set of facts, “ancillary services” provided (General Business Law § 394-c [1] [b] [“ ‘ancillary services’ . . . (include) grooming, cosmetology, dating etiquette, dating counseling, or other services”]) arguably should have no separate economic value (General Business Law § 394-c [2-a] [“No social referral service provider shall require the purchase of an ancillary service by a purchaser of a social referral service as a condition of entering into a social referral service contract with such provider”]).