# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-01183-SCT

*TUNICA COUNTY, MISSISSIPPI*

*v.*

*TOWN OF TUNICA, MISSISSIPPI, TUNICA COUNTY SCHOOL DISTRICT, JIM HOOD, ATTORNEY GENERAL AND STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/24/2015 |
| TRIAL JUDGE: | HON. HENRY L. LACKEY |
| TRIAL COURT ATTORNEYS: | ELLIS TURNAGE |
| | J. CHADWICK MASK |
| | REGINA R. QUINN |
| | LEE DAVIS THAMES, JR. |
| | CLIFTON MICHAEL DECKER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ELLIS TURNAGE |
| ATTORNEYS FOR APPELLEES: | J. CHADWICK MASK |
| | CHRISTOPHER H. COLEMAN |
| | CLIFTON M. DECKER |
| | REGINA R. MAY |
| | JOHN RICHARD MAY, JR. |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY:    LEE DAVIS THAMES, JR. |
| NATURE OF THE CASE: | CIVIL - UNCONSTITUTIONAL STATUTE |
| DISPOSITION: | AFFIRMED IN PART, VACATED IN PART, AND REMANDED - 05/11/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. Tunica County seeks review of the Tunica County Circuit Court's summary-judgment ruling that a local and private law requiring the County to distribute portions of a revenue-based gaming fee to the Town of Tunica and the Tunica County School District was constitutional. Finding that the County has failed to meet its burden of proving that the legislation in question is unconstitutional or otherwise unlawful, we affirm the trial court's grant of summary judgment. However, because the trial court failed to provide a basis for its award of attorney's fees and did not make any findings concerning the reasonableness of the amounts awarded, we vacate the award of attorney's fees and remand this case to the trial court for further consideration of that issue.

### FACTS & PROCEDURAL HISTORY

¶2. Tunica County asks this Court to evaluate the constitutionality of certain provisions of Chapter Number 920, Local and Private Laws of 2004 ("House Bill 1002"). House Bill 1002 is the most recent iteration of a long line of local and private legislation dating back to 1992, which was passed after the enactment of the Mississippi Gaming Control Act in 1990. *See* 1992 Miss. Local and Private Laws ch. 866.[1]

¶3. House Bill 1002 authorizes the Tunica County Board of Supervisors to impose a fee of up to 3.2 percent of gross gaming revenue on all gaming vessels located within or

---

[1] Similar legislation has been enacted in every county that allows legalized gambling. *See*, *e.g.*, 1992 Miss. Local and Private Laws ch. 868 (Biloxi, D'Iberville, and Gulfport); 1993 Miss. Local and Private Laws ch. 923 (Hancock County); 1993 Miss. Local and Private Laws ch. 925 (Warren County); 1994 Miss. Local and Private Laws ch. 960 (Coahoma County); 1994 Miss. Local and Private Laws ch. 972 (Adams County); 1995 Miss. Local and Private Laws ch. 1015 (Harrison County); 1994 Miss. Local and Private Laws ch. 1905 (Washington County).

contiguous to Tunica County. 2004 Miss. Private and Local Laws ch. 920, § 1(a). The law instructs the Mississippi State Tax Commission (now the Mississippi Department of Revenue) to calculate, collect, and enforce the collection of this fee in the manner provided for the collection of licensing fees under Mississippi law. *Id.* at § 2(a). The law also directs the distribution and expenditure of this fee. Critical to this case, the law requires ten percent of the fee to be distributed to the Town of Tunica "for deposit into the general fund of the municipality" and provides the purposes for which those funds may be expended by the Town. *Id.* at § 2(b)(iv).[2] Additionally, twelve percent of the fee must be expended for "educational purposes in Tunica County," and two percent must be expended for "teacher's salary supplementation and teacher training." *Id.* at §§ 2(b)(iii), (v). Tunica County School District is not mentioned anywhere in HB 1002 or its predecessors.

¶4. The County has levied the fee authorized by House Bill 1002 and its predecessors since 1994, and it distributed the proceeds of the fee as required by House Bill 1002 until 2014. According to the County's complaint, the gaming industry experienced a sharp decline between 2007 and 2014, cutting the fees it collected under House Bill 1002 roughly in half during that period. As a result, in November 2013, the Tunica County Board of Supervisors petitioned the Legislature to decrease the Town's distribution under House Bill 1002 from ten percent to five percent and to increase the share of the fee that could be deposited into the County's general fund. The Legislature rejected this proposal. Thus, in October 2014, the Tunica County Board of Supervisors resolved to cease the distributions required by House

---

[2] This requirement was added to the legislation in 1995, and the amount of the distribution has increased over the years.

3

Bill 1002 and filed a lawsuit in Tunica County Circuit Court challenging the constitutionality of the law's distribution requirements.[3] The County named the Town and the School District as defendants. Because the County's complaint challenged the constitutionality of a statute, the State of Mississippi, through the Mississippi Attorney General's Office, was allowed to intervene to defend the constitutionality of House Bill 1002.

¶5.    The County's complaint alleged that House Bill 1002 violated several sections of Articles 3 and 4 of the Mississippi Constitution, as well as certain provisions of the Mississippi Code.  Specifically, the County argued that House Bill 1002 deprived it of its property interest in the casino fees without due process of law. In addition, the County asserted that the distributions required by House Bill 1002 constituted an unlawful donation of public funds. The County also argued that House Bill 1002 impermissibly suspended certain general statutes and provided improper support for a common school.  Alternatively, the County alleged that House Bill 1002 violated Mississippi common law and that the current Board of Supervisors could not be bound by the decisions of prior Boards to comply with the law. The County asked the circuit court to declare House Bill 1002 unconstitutional and issue an injunction against the continued enforcement of the statute. On November 13, 2014, the County filed a motion for a temporary injunction against the enforcement of House Bill 1002 during the litigation.

¶6.    On November 26, 2014, the Town filed an answer denying all of the allegations in the County's complaint and affirmatively asserting that House Bill 1002 is constitutional in all

---

[3] The County amended its complaint on November 13, 2014.

4

respects. In addition, the Town filed a counterclaim for injunctive relief against the County, asking the trial court to require the County to come into complance with House Bill 1002. The School District filed its answer and an identical counterclaim on January 28, 2015.

¶7. On February 5, 2015, the Town filed a separate Application for Preliminary Injunction seeking an order enjoining the County from disregarding the distribution mandates of House Bill 1002 and requiring the County to come into immediate compliance with the law. The School District joined in this application.

¶8. The trial court held a comprehensive hearing on the parties' competing motions on June 18, 2015. The parties were allowed to call witnesses and present evidence at this hearing. The County's primary argument at the hearing was that HB 1002 "causes Tunica County to donate, and to give without consideration – give away 24 percent of their money." The County also argued that HB 1002 conflicted with general statutes that authorized both counties and municipalities to collect "local government fees" from casinos operating within their borders. Following the hearing, the trial court issued an opinion holding that the County had not met its burden of proving that House Bill 1002 was unconstitutional. The court found that House Bill 1002 "and all its predecessors contain a clear and unambiguous legislative mandate as to how the fees accumulated by the enforcement of the Act are to be disbursed and must immediately be followed." Accordingly, the trial court denied the declaratory and injunctive relief requested by the County and granted the preliminary and permanent injunctive relief sought by the Town and the School District. The trial court also awarded attorneys' fees to the Town and the School District and ordered the County to be assessed

5

interest at the highest legal rate for all funds it had been withholding from the Town and the School District in violation of House Bill 1002.

¶9. Following the trial court's ruling, the Town filed a motion for summary judgment. The County did not file a response. On July 28, 2015, the trial court entered an order granting summary judgment to the defendants. The County filed its notice of appeal on August 3, 2015. On December 3, 2015, the trial court entered another order again granting the Town's motion for summary judgment. The order indicates that the trial court previously had granted the Town's motion but had not filed it in order to give the County time to respond. After failing to receive a timely response from the County, the trial court reinstated its original order granting summary judgment. Thereafter, on December 18, 2015, the County filed its final notice of appeal with this Court.

¶10. On appeal, the County raises nine issues, which we have reorganized into the following four issues for the sake of clarity:

> **I.     Whether House Bill 1002 is unconstitutional.**
>
> **II.    Whether the current Tunica County Board of Supervisors is bound by House Bill 1002.**
>
> **III.   Whether the circuit court erred in granting the Town's motion for summary judgment.**
>
> **IV.    Whether the circuit court erred in awarding attorney's fees and interest to the defendants.**

## STANDARD OF REVIEW

¶11. It is well-settled that a trial court's grant of summary judgment is reviewed de novo. *Jones Cty. Sch. Dist. v. Miss. Dep't of Revenue*, 111 So. 3d 588, 608 (Miss. 2013)

6

(collecting citations). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories and admissions on file . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). This Court must review the evidence in the light most favorable to the nonmoving party, and the movant bears the burden of showing that no genuine issue of material fact exists. *Hooker v. Greer*, 81 So. 3d 1103, 1108 (Miss. 2012) (citing *Waggoner v. Williamson*, 8 So. 3d 147, 152 (Miss. 2009)). In addition, a trial court's rulings concerning the constitutionality of a statute are reviewed de novo. *Oxford Asset Partners, LLC v. City of Oxford*, 970 So. 2d 116, 120 (Miss. 2007). The trial court's grant of attorney's fees is reviewed for an abuse of discretion. *Tupelo Redevelopment Agency v. Gray Corp., Inc.*, 972 So. 2d 495, 518 (Miss. 2007).

## DISCUSSION

### I.      Whether House Bill 1002 is unconstitutional.

¶12.    The County's primary argument on appeal is that the distribution requirements contained in House Bill 1002 violate various provisions of Articles 3 and 4 of the Mississippi Constitution. As the party challenging the constitutionality of a statute, the County "must 'overcome the strong presumption' that the Legislature acted within its constitutional authority" when it passed HB 1002. *5K Farms, Inc. v. Miss. Dep't of Revenue*, 94 So. 3d 221, 226 (Miss. 2012) (quoting *Cities of Oxford, Carthage, Starkville and Tupelo v. Ne. Miss. Elec. Power Ass'n*, 704 So. 2d 59, 65 (Miss. 1997)). "When a party invokes our power of judicial review, it behooves us to recall that the challenged act has been passed by

7

legislators and approved by a governor sworn to uphold the selfsame constitution as are we." ***State v. Roderick***, 704 So. 2d 49, 52 (Miss. 1997). "[T]he courts are without the right to substitute their judgment for that of the Legislature as to the wisdom and policy of the act and must enforce it, unless it appears *beyond all reasonable doubt* to violate the Constitution." ***Pathfinder Coach Div. of Superior Coach Corp. v. Cottrell***, 62 So. 2d 383, 385 (Miss. 1953) (emphasis added). "If possible, courts should construe statutes so as to render them constitutional rather than unconstitutional if the statute under attack does not clearly and apparently conflict with organic law after first resolving all doubts in favor of validity." ***Loden v. Miss. Pub. Serv. Comm'n***, 279 So. 2d 636, 640 (Miss. 1973) (citations omitted). In other words, "to state that there is doubt regarding the constitutionality of an act is to essentially declare it constitutionally valid." ***Moore v. Bd. of Supervisors of Hinds Cty.***, 658 So. 2d 883, 887 (Miss. 1995).

¶13. The County's arguments on this issue can be grouped into the following five categories: (1) House Bill 1002 deprives it of property without due process; (2) House Bill 1002 grants a donation to the Town and the School District; (3) House Bill 1002 suspends general laws; (4) the Legislature did not comply with the constitutional requirements for enacting House Bill 1002; and (5) House Bill 1002 gives support to a common school. We address each of these arguments separately below.

### A. Whether House Bill 1002 deprives the County of property without due process.

¶14. The County's first argument on appeal is premised on the assumption that it has an inherent right to the use of all proceeds of the fees collected under House Bill 1002. Thus,

the County asserts that House Bill 1002's distribution provisions constitute a deprivation of its property interest without due process of law, in violation of Article 3, Sections 14 and 32 of the Mississippi Constitution.

¶15.    Article 3, Section 14 provides, "No person shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art. 3, § 14 (1890). This Court has held that "[t]he due process required by the Federal Constitution is the same 'due process of law' which is required by" Article 3, Section 14. *Walters v. Blackledge*, 71 So. 2d 433, 515 (Miss. 1954). "Due process guards each person's every substantial entitlement created and made legitimate and protected from interference by the positive law of the state." *In re Validation of $7,800,000 Combined Utility Sys. Revenue Bond, Gautier Utility Dist., Jackson Cty.*, 465 So. 2d 1003, 1018 (Miss. 1985) (hereinafter "*In re Validation*"). "To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

¶16.    We find that the County lacks standing to challenge House Bill 1002 on due-process grounds. The United States Supreme Court has held that a political subdivision of the state "cannot invoke the protection of the Fourteenth Amendment against the state." *City of Newark v. New Jersey*, 262 U.S. 192, 196, 43 S. Ct. 539, 67 L. Ed. 943 (1923). This is because "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in

9

opposition to the will of its creator." ***Williams v. Mayor and City Council of Baltimore***, 289 U.S. 36, 40, 53 S. Ct. 431, 77 L. Ed. 1015 (1933). *See also* ***State v. Hinds Cty. Bd. of Supervisors***, 635 So. 2d 839, 843 (Miss. 1994) (citing ***City of Trenton v. State of New Jersey***, 262 U.S. 182, 43 S. Ct. 543, 67 L. Ed. 937 (1923); ***Bd. of Levee Comm'rs of the Orleans Levee Bd. v. Huls***, 852 F.2d 140, 142-43 (5th Cir. 1988)) ("It has been established that political subdivisions of the state have no Fifth or Fourteenth Amendment protections against the state.").

¶17. While the County does not raise any specific claims under the United States Constitution, this Court has regarded Article 3, Section 14 of our Constitution to be "essentially identical" to its federal counterpart. ***Nat'l Collegiate Athletic Ass'n v. Gillard***, 352 So. 2d 1072, 1081 (Miss. 1977). Thus, the reasoning of the federal courts and this Court in applying the Due Process Clause of the Fourteenth Amendment are instructive on this issue. Furthermore, this Court has held on several occasions that a political subdivision of the State cannot challenge the constitutionality of a statute on due-process grounds. *See **Ne. Miss. Elec. Power Ass'n***, 704 So. 2d at 67 ("It is admitted by the municipalities that they have no due process rights against the Legislature."); ***Tally v. Bd. of Supervisors of Smith Cty.***, 307 So. 2d 553, 557 (Miss. 1975) ("[T]he due process requirement of the Fourteenth Amendment to the Constitution of the United States, and Section 14 of the Mississippi Constitution (1890) are directed to the protection of individuals and do not apply to frustrate state agencies in their relationship with each other."). The cases cited by the County are inapposite, as the parties invoking due-process protections in those cases were individual

citizens, not governmental entities. *See, e.g.*, ***City of Jackson v. Tucker***, 202 So. 3d 199, 203 (Miss. 2016) (finding that a minor condemnee had standing to sue condemnor for a violation of due process, as the condemnee had a property interest, voidable at his option, in the property in question); ***Miss. Power Co. v. Miss. Pub. Serv. Comm'n***, 168 So. 3d 905 (Miss. 2015) (finding that Mississippi Public Service Commission's noncompliance with Base Load Act violated ratepayers' due process rights by depriving them of their money without notice); ***Tucker v. Hinds Cty.***, 558 So. 2d 869, 874 (Miss. 1990) (finding that a private citizen had a property right in the continuance of his utility services). Accordingly, the County's argument fails.

¶18. Notwithstanding the County's lack of standing, the County's argument is without merit because its authority to impose the 3.2 percent gaming fee comes from the Legislature, not the constitution. "The revenues of a county are subject to the control of the Legislature, and when the Legislature directs their application to a particular purpose or to the payment of the claims of particular parties, the obligation to so pay is thereby imposed on the county." ***Jackson Cty. v. Neville***, 95 So. 626, 629 (Miss. 1923). Thus, "it follows that the Legislature had the authority to establish the purpose of the tax and to direct where the funds would be spent." ***Pascagoula Sch. Dist. v. Tucker***, 91 So. 3d 598, 606 (Miss. 2012) (citing ***Harrison Cty. Sch. Dist. v. Long Beach Sch. Dist.***, 700 So. 2d 286 (Miss. 1997)). The County has no inherent right to the proceeds of the fees authorized by House Bill 1002 aside from that statute itself, so the distribution provisions of House Bill 1002 do not constitute a deprivation of any property right. This argument is without merit.

¶19. The County also cites Article 3, Section 32, which provides, "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." Miss. Const. art. 3, § 32 (1890). However, the County does not explain how this provision applies to the instant case. None of the cases cited by the County discusses the application of Article 3, Section 32, and the County's discussion of this provision is almost nonexistent. The County merely references Article 3, Section 32 as part of its general argument that House Bill 1002 violates its right to due process. Because the County has failed to support its argument with sufficient authority, this particular argument is procedurally barred. *See **Boutwell v. Boutwell**,* 829 So. 2d 1216, 1223 (Miss. 2002) (citing ***Pickering v. Industria Masina I Traktora***, 740 So. 2d 836, 848 (Miss. 1999)) ("Failure to cite authority in support of claims of error precludes this Court from considering the specific claim on appeal.").

### B. Whether House Bill 1002 grants a donation or "unauthorized payment" to the Town and the School District.

¶20. The County asserts that House Bill 1002 requires it to make unconstitutional donations to the Town and the School District. This claim is somewhat related to the County's due-process argument presented in Issue I(A) above, as it is based on the premise that the provisions of House Bill 1002 require it to give away money that it otherwise would have the right to keep for itself. In support of this argument, the County relies on Article 4, Sections 66 and 96 of the Mississippi Constitution. While the County presents its arguments

12

concerning these two provisions somewhat interchangeably, it is better to discuss them separately, as they do not explicitly govern the same subject matter.

### 1. Article 4, Section 66

¶21. The County argues that the distributions required by House Bill 1002 constitute donations to the Town and the School District in violation of Article 4, Section 66 of the Mississippi Constitution, which provides, "No law granting a donation or gratuity in favor of any person or object shall be enacted except by the concurrence of two-thirds of the members elect of each branch of the Legislature, nor by any vote for a sectarian purpose or use." Miss. Const. art. 4, § 66 (1890). "The term 'donation or gratuity' implies absence of consideration, the transfer of money or other things of value from the *owner* to another without any consideration." *Craig v. Mercy Hosp.-Street Mem'l*, 45 So. 2d 809, 814 (Miss. 1950) (emphasis added). Of course, "[i]f there is no 'donation or gratuity' involved in the instant case, then Section 66 has no application at all." *Id.* It also is critical to note that Article 4, Section 66 does not impose an outright prohibition against *all* laws granting donations and gratuities but only those enacted "for a sectarian purpose or use." Miss. Const. art. 4, § 66 (1890). A law not falling within this prohibition simply must receive the requisite support from both houses of the Legislature to be valid. *Id.*

¶22. The County does not argue that the distributions required by House Bill 1002 are for a sectarian purpose or use, and no evidence in the record would support such an argument. Thus, the only other limit on the Legislature's authority under Article 4, Section 66 is the requirement that a statute must receive the support of "two-thirds of the members elect of each

13

branch of the Legislature." Miss. Const. art. 4, § 66 (1890). But the voting requirement of Article 4, Section 66 is not a justiciable question. *Turner v. City of Hattiesburg*, 53 So. 681, 682-83 (Miss. 1910) ("It is alleged that chapter 120 failed to receive the concurrence of two-thirds of each branch of the Legislature, and therefore was not passed in accordance with section 66 of the Constitution of 1890 . . . . [T]his objection to the act does not raise a judicial question."). As no argument is advanced that under Article 4, Section 66, the statute grants a donation or gratuity for a sectarian purpose or use, this argument fails.

### 2. Article 4, Section 96

¶23. Article 4, Section 96 provides, in relevant part, "The Legislature shall never grant extra compensation, fee, or allowance, to any public officer, agent, servant, or contractor, after service rendered or contract made, nor authorize payment, or part payment, of any claim under any contract not authorized by law . . . ." Miss. Const. art. 4, § 96 (1890). While this provision specifically mentions only the Legislature, this Court has held that it applies equally to all subordinate state agencies created by the Legislature. *Clark v. Miller*, 105 So. 502, 505 (Miss. 1925). The County's argument here essentially mirrors the argument it presented concerning Article 4, Section 66 – the distributions required by House Bill 1002 qualify as "extra compensation," given to the County and School District without consideration.

¶24. Article 4, Section 96 is not subject to a reasonable interpretation that would support the County's argument that the distributions required by House Bill 1002 are unauthorized payments. This Court consistently has interpreted Article 4, Section 96 as applying in the context of employment and contractual relationships, that is, to prohibit governmental entities

14

from making unauthorized payments, such as bonuses, "fifty-third paychecks," retroactive raises, and compensation above a contracted rate, to government employees or other individuals or entities contracted for government work. *See*, *e.g.*, ***Nichols v. Patterson***, 678 So. 2d 673 (Miss. 1996) (holding that municipality's practice of paying employees a "fifty-third paycheck" violated Article 4, Section 96, and could not be considered compensation for services rendered, as the extra check was not included in employees' payroll salaries); ***Golding v. Salter***, 107 So. 2d 348, 356-57 (Miss. 1958) (holding that county hospital had no authority to pay its employees Christmas bonuses); ***State, for Use of Wimberly v. White***, 157 So. 472, 474 (Miss. 1934) (holding that Senate resolution granting additional compensation over the salary provided by statute to an employee of the Governor's Office violated Article 4, Section 96); ***Moore v. Walley***, 120 So. 197, 198 (Miss. 1929) (holding that the Legislature violated Article 4, Section 96 by reimbursing the state land commissioner for amounts paid out during the previous year to hire additional employees, as he was allowed one deputy by law); ***Miller***, 105 So. at 504 (holding that Yazoo Mississippi Delta Levee Board's payment of additional compensation in excess of the contracted amount to a construction contractor was unconstitutional). This interpretation is in line with the provision's plain language. On the other hand, Article 4, Section 96 never has been interpreted to limit the Legislature's authority to direct the distribution of statutory fees which, as previously discussed, are not property of the County. *See Neville*, 95 So. at 629. The County has failed to meet its burden of proving beyond a reasonable doubt that House Bill 1002 directly conflicts with Article 4, Section 96.

### C. Whether House Bill 1002 suspends general laws.

¶25. In its third assignment of error on appeal, the County argues that House Bill 1002 unconstitutionally "suspends" certain general laws in violation of Article 4, Section 88 of the Mississippi Constitution. As an initial matter, we note that Article 4, Section 88 has no direct application to this case. That provision merely authorizes the Legislature to enact general laws:

> The Legislature shall pass general laws, under which local and private interest shall be provided for and protected, and under which cities and towns may be chartered and their charters amended, and under which corporations may be created, organized, and their acts of incorporation altered; and all such laws shall be subject to repeal or amendment.

Miss. Const. art. 4, § 88 (1890). The suspension of general laws is addressed specifically in the preceding constitutional provision.

¶26. Article 4, Section 87 sets certain limitations on the Legislature's authority to enact special legislation or suspend general laws:

> No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law, or where the relief sought can be given by any court of this State; nor shall the operation of any general law be suspended by the Legislature for the benefit of any individual or private corporation or association, and in all cases where a general law can be made applicable, and would be advantageous, no special law shall be enacted.

Miss. Const. art. 4, § 87 (1890). As the above-quoted language clearly indicates, Article 4, Section 87 applies "only where there has been a local or private law enacted for the benefit of 'private individuals or corporations.'" ***Bond v. Marion Cty. Bd. of Supervisors***, 807 So. 2d 1208, 1217 (Miss. 2001) (quoting Miss. Const. art. 4, § 87 (1890)). "We think the purpose

16

of section 87 was to prevent local and special laws for such corporations as were not public in their nature. The Legislature has usually exercised full control over municipal corporations; the functions of both a municipal corporation and the Legislature being entirely public in their nature." *Feemster v. City of Tupelo*, 83 So. 804, 806 (Miss. 1920). The Court in *Feemster* further explained:

> Whatever mischief may lie in the passing of special bills or laws of the kind here involved (and it may be conceded that such acts are not wholesome as a rule), the Constitution . . . vests in the Legislature, and not the court, the function of deciding this question, and we cannot refuse to enforce any law because merely in our judgment a general law would be better than a special one. The Legislature has been recognized by the Constitution makers as being the best equipped to deal with the wisdom of enacting special laws rather than general laws, except in cases specifically provided for in the Constitution.

*Id.* If this Court finds that Article 4, Section 87 does not apply to a statute, it must abide by the mandate of Article 4, Section 89: "If a bill is passed in conformity to the requirements hereof, other than such as are prohibited in the next section, the courts shall not, because of its local, special, or private nature, refuse to enforce it." Miss. Const. art. 4, § 89 (1890).

¶27. "In determining the beneficiary of private or local laws, we consider: (1) to whom the legislation is directed or applied and (2) whether the aim or thrust of the bill is to benefit the public." *Oxford Asset Partners*, 970 So. 2d at 121 (citing *Bond*, 807 So. 2d at 1217). House Bill 1002 plainly applies to two specific governmental entities: Tunica County and the Town of Tunica. Additionally, while the purpose of House Bill 1002 is not explicitly stated, its provisions make clear that its aim is to fund the increased infrastructural needs associated with legalized gambling within Tunica County. Accordingly, we find that Article 4, Section 87 has no application here as it relates to the suspension of general laws.

17

¶28. Even assuming for argument's sake that Article 4, Section 87 does apply in this case, the County's argument still is without merit. A specific requirement triggering the application of Article 4, Section 87 is the "suspension" of a general law. The term "suspend," as used in this provision, means "[t]o interrupt; to cause to cease for a time; to postpone; to stay, delay, or hinder; to discontinue temporarily . . . ." ***In re Validation of $15,000,000 Hosp. Revenue Bonds v. City of Hattiesburg***, 361 So. 2d 44, 49 (quoting *Black's Law Dictionary* (rev. 4th ed. 1968)). The County claims that House Bill 1002 suspends the operation of two general statutes. First, the County cites Section 19-3-40 of the Mississippi Code, also known as the "County Home Rule." Section 19-3-40 sets out the powers and duties of county boards of supervisors and explicitly prohibits them from taking certain actions, including "grant[ing] any donation[.]" Miss. Code Ann. § 19-3-40(3)(f) (Rev. 2012). The County claims that House Bill 1002 suspends the operation of Section 19-3-40(3)(f) by requiring it to donate funds to the Town and the School District.

¶29. We find this argument to be without merit. First, the distributions required by House Bill 1002 do not constitute donations, because the County has no inherent right to the entire proceeds of the 3.2 percent fee. But even if this Court found that the distributions were donations, the result would be the same. The County is allowed to take the actions otherwise prohibited by the County Home Rule if "such actions are specifically authorized by another statute or law of the State of Mississippi." Miss. Code Ann. § 19-3-40(3). Thus, even if the distributions required by House Bill 1002 could be considered donations, House Bill 1002 –

18

"a statute or law of the State of Mississippi" – specifically authorizes the County to distribute them. Accordingly, this argument is without merit.

¶30. Next, the County cites Section 75-76-195, a provision of the Mississippi Gaming Control Act that authorizes counties and municipalities to collect license fees from casinos. Miss. Code Ann. § 75-76-195(1) (Rev. 2016). Under this statute, municipalities are authorized to impose a revenue-based fee, which fluctuates between .4 percent and .8 percent, on all casinos operating within their municipal borders. *Id.* Likewise, counties are authorized to impose the same fee on all casinos operating within the unincorporated areas of the county. *Id.* Here, the County argues that the Town is not entitled to collect the fee authorized by Section 75-76-195 because no casinos operate within the Town's municipal borders. The County also points out that, under Section 75-76-197, the Gaming Control Act's distribution provision, it is not required to distribute any of the fees it collects under Section 75-76-195 to the Town. *See* Miss. Code Ann. § 75-76-197(b) (Rev. 2016) ("Fees designated as 'local government fees' remitted by licensees who are not located within an incorporated municipality shall be distributed to the county in which the licensee is located."). According to the County, House Bill 1002 suspends these two provisions of the Gaming Control Act by allowing the Town to collect fees from casinos that do not operate within the Town's municipal borders.

¶31. We find this argument to be without merit. The statutory scheme at issue in this case is similar to the one presented in *In re Validation of $15,000,000 Hospital Revenue Bonds (Methodist Hospital Project) Series 1978, City of Hattiesburg, Forrest and Lamar Counties,*

19

*Mississippi*, 361 So. 2d 44 (Miss. 1978), in which this Court reviewed the constitutionality of special legislation authorizing the City of Hattiesburg to issue bonds to provide funds for the purpose of acquiring hospital facilities, with the principal, interest, and related expenses of the bonds to be paid from the revenues to be derived form the lease of the facilities. The appellant argued that this legislation violated Article 4, Section 87 by suspending a general law which provided a different method through which municipalities could acquire and own hospitals. *Id.* at 47. This Court rejected that argument, finding that the private legislation "provided the City of Hattiesburg an alternative method of raising funds for the purpose of acquiring hospital facilities in that municipality. It is clear that the municipal government might have proceeded under the general law or, at its election, might have proceeded under the terms of the Local and Private Act." *Id.* at 49.

¶32.     Similarly, House Bill 1002 and Section 75-76-195 are separate statutes that authorize the County to impose two separate fees on casinos. In other words, the fee authorized by House Bill 1002 operates in addition to, and not in replacement of, the fee authorized by Section 75-76-195. The County does not cite any authority that would prohibit it from imposing both fees. In addition, the distribution provisions of Section 75-76-197 apply only to "gross revenue fees collected under the provisions of Section 75-76-195[.]" Miss. Code Ann. § 75-76-197. The fee collected under House Bill 1002 obviously is not "collected under the provisions of Section 75-76-195," so its own distribution provisions apply and do not conflict with the Gaming Control Act. Accordingly, House Bill 1002 does not suspend these provisions of the Gaming Control Act.

¶33.    The County also asserts that House Bill 1002 does not comply with the so-called *In re Validation* test applied by this Court to review special legislation that indirectly benefits private parties.  *See Oxford City Partners*, 970 So. 2d at 122 (citing *In re Validation*, 465 So. 2d at 1017).  The *In re Validation* test provides that "[t]he Legislature may suspend a general law by a private law that concerns the same subject matter so long as '(1) the object and purpose of each act is consistent with the other; and (2) where the differences between them are primarily procedural and minor.'" *Oxford City Partners*, 970 So. 2d at 122 (quoting *Bond*, 807 So. 2d at 1219 (citing *In re Validation*, 465 So. 2d at 1017)).  Of course, the application of this test is triggered by the suspension of a general law, and we find that no general law is suspended by House Bill 1002.

¶34.    We recognize that the County raises essentially this same argument as a separate issue later in its brief, claiming that House Bill 1002 "conflicts" with the Gaming Control Act and "exempts" the Town from following it.  The County also included in the following allegation in the Statement of Issues section of its appellate brief: "Whether H.B. 1002 (2004) is in direct contradiction with Miss. Code Ann. § 21-17-5, Mississippi's "Home Rule" statute."[4]  However, this issue does not appear in the Argument sections of the County's briefs.  Moreover, the County provides no authority distinguishing these arguments from the constitutional arguments just discussed. Accordingly, we will not discuss these "separate" arguments.

----

[4]  Section 21-17-5 of the Mississippi Code is the Municipal Home Rule statute, not the County Home Rule Statute. *See* Miss. Code Ann. § 21-17-5 (Rev. 2015).

**D. Whether the Legislature failed to comply with the constitutional requirements for enacting House Bill 1002.**

¶35. The County claims that the Legislature failed to follow the constitutionally required procedures for enacting local and private legislation when it passed House Bill 1002. In support of this argument, the County cites Article 4, Section 89 of the Mississippi Constitution, which provides:

> There shall be appointed in each house of the Legislature a standing committee on local and private legislation; the House committee to consist of seven representatives, and the Senate committee of five Senators. No local or private bill shall be passed by either House until it shall have been referred to said committee thereof, and shall have been reported back with a recommendation in writing that it do pass, stating affirmatively the reasons therefor, and why the end to be accomplished should not be reached by a general law, or by a proceeding in court; or if the recommendation of the committee be that the bill do not pass, then it shall not pass the House to which it is so reported unless it be voted for by a majority of all members elected thereto. If a bill is passed in conformity to the requirements hereof, other than such as are prohibited in the next section, the courts shall not, because of its local, special, or other private nature, refuse to enforce it.

Miss. Const. art. 4, § 89 (1890). The County argues that House Bill 1002 is unenforceable because it was not enacted in compliance with the above requirements. Specifically, the County alleges that there are no "legislative findings set forth in House Bill 1002" as to why the end to be accomplished through its passage could not be reached by a general law or a court proceeding.

¶36. This argument is without merit for two reasons. First, Article 4, Section 89 is a rule of legislative procedure not subject to judicial review. The judicial branch of government "is not an overseer of the legislature during its labors, but it takes its completed work, and tries it by the constitution, starting with the conclusive and irrebuttable presumption that as to all

22

requirements of that instrument they who swore to observe it did it." ***Hunt v. Knight***, 70 Miss. 298, 11 So. 608, 610 (Miss. 1892). In this regard, this Court has long held that it will not consult legislative journals to determine whether a law was passed in accordance with Article 4, Section 89. *See **State v. Jackson***, 81 So. 1, 2 (Miss. 1919). "[T]he Court will not invalidate a statute by ascertaining from the journals of the legislature whether that body complied with section 89 . . . ." ***Alden v. Lewis***, 182 So. 2d 600, 607 (Miss. 1966). With the exception of the substantive considerations set out in Article 4, Sections 87 and 90, which are discussed elsewhere in this opinion, the passage of House Bill 1002 "was a matter for the Legislature and this Court will enforce the legislative mandate of Mississippi Constitution, Article 4, Section 89 (1890)." ***City of Hattiesburg***, 361 So. 2d at 48.

### E. Whether House Bill 1002 provides support for a common school.

¶37. The County argues that House Bill 1002's requirement that certain percentages of the gaming fee's proceeds be used for certain educational purposes violates Article 4, Section 90(p) of the Mississippi Constitution. Article 4, Section 90 sets forth certain matters for which the Legislature shall not pass local, private, or special laws. Miss. Const. art. 4, § 90 (1890). With regard to the instant case, Section 90(p) requires that "[p]roviding for the management or support of any private or common school, incorporating the same, or granting such school any privileges" can be accomplished only through general laws.[5] Miss. Const. art. 4, § 90(p)

---

[5] "[A] law is general in the constitutional sense, which applies to and operates uniformly on all members of any class of persons, places, or things requiring legislation peculiar to itself in matters covered by the law . . . . [T]hey operate on every person who is brought within the relations and circumstances provided for." ***Toombs v. Sharkey***, 106 So. 273, 275 (Miss. 1925) (quoting 25 R.C.L. p. 815, § 66).

(1890). The County argues that the fee distributions set aside for educational purposes violate Article 4, Section 90(p). This argument applies only to the twelve-percent distribution set aside for "educational purposes within Tunica County" and the two-percent distribution set aside for "teacher's salary supplementation and teacher training" and has no bearing on the constitutionality of the ten-percent distribution to the Town required by House Bill 1002.

¶38. This particular area of law is relatively undeveloped, as this Court has had only a few occasions to review claims under Article 4, Section 90(p). However, in all but one of the cases in which this Court has found a violation of Article 4, Section 90(p), the statute under review granted specific privileges or funding to a specific named school or school district. *See Hewes v. Langford*, 62 So. 358 (Miss. 1913) (striking down a private law authorizing the Harrison County school board to establish a separate school district in Harrison County and setting the geographic limits of the district); *Scarborough v. McAdams Consol. Sch. Dist.*, 87 So. 140 (Miss. 1921) (holding that a private law authorizing the issuance of bonds for the purpose of building an agricultural high school in the McAdams consolidated school district violated Article 4, Section 90(p)); *Hamilton v. Bd. of Supervisors of Lafayette Cty.*, 96 So. 465 (Miss. 1923) (holding that private legislation validating bonds for the Taylor consolidated school district was unconstitutional); *Williamson v. Howell*, 124 So. 319, 321 (Miss. 1929) (striking down private legislation conferring special privileges on the Arnold Line consolidated school district). This fact was acknowledged in *Board of Education of Benton County v. State Educational Finance Commission*, 138 So. 2d 912, 924 (Miss. 1962), in which the Court was asked to review the constitutionality of private legislation setting the procedure for challenging student-transfer decisions of school districts. The appellant argued

that the statute violated Article 4, Section 90(p) by excluding from its terms all children living in a county which is not organized under a "county unit system." *Id.* In support of this argument, the appellant cited *Scarborough* and *Howell*, both of which are mentioned above. *Id.* This Court rejected the appellant's argument, finding that the statues at issue in those cases named a particular school and provided benefits to that school, to the exclusion of all others. *Id.*

¶39. The sole exception to the above trend is found in *State Board of Education v. Pridgen*, 63 So. 416 (Miss. 1913), in which this Court reviewed the constitutionality of private legislation appropriating funds to supplement the state common school fund. At the time of *Pridgen*, Article 8, Section 206 of the Mississippi Constitution provided for a "county common school fund which shall consist of the poll tax, to be retained in counties where the same is collected," as well as a "state common school fund, to be taken from the general fund in the state treasury," the combination of which "shall be sufficient to maintain the common schools for the term of four months in each scholastic year."[6] *Id.* at 417 (quoting Miss. Const. art. 8, § 206). Proceeds of the state fund were distributed among county and separate school districts "in proportion to the number of educable children in each[.]" *Id.* County and separate school districts also were authorized to levy an additional tax to maintain their schools past the term of four months. *Id.* In 1912, the Legislature passed special legislation appropriating $5,000 "to be used 'when any county in the state, administering its school on the present basis of state aid, shall have exhausted all money appropriated by the state for common school

---

[6] The county common school fund since has been removed from Article 8, Section 206.

purposes, and whose schools cannot run for the constitutional period of four months.'" ***Id.*** Under the terms of this legislation, and upon the request of the Jackson County Superintendent of Education, the State Board of Education issued an order directing the auditor of public accounts to pay the Jackson County treasurer roughly $2,000 from the supplemental fund. ***Id.*** A private citizen filed a complaint for an injunction against this payment, and the chancellor granted the complaint. ***Id.***

¶40. On appeal, this Court held that the supplemental common school fund violated Article 8, Sections 205 and 206, and Article 4, Section 90(p). ***Id.*** at 418. This Court held that the scheme for establishing and funding common schools set forth in Article 8, Sections 205 and 206 was "necessarily exclusive, otherwise the Legislature could ignore the plan of the Constitution and provide another and essentially different plan for the support of the common schools . . . . [T]he Legislature has no power to adopt another and different basis for state aid, which ignores the constitutional unit." ***Id.*** at 417-18. In addition, the Court acknowledged Article 4, Section 90 "seems to make clear that the support of the common schools by appropriation from the state treasury can only be done in the manner and upon the plan prescribed by sections 205 and 206." ***Id.*** at 418. This Court noted that the legislation in question created a class of common schools – those that could not afford to stay open for the constitutionally required term of four months – and rewarded that class with benefits not available to other common schools under the law. ***Id.***

¶41. As recognized by this Court in ***Benton County***, House Bill 1002 is distinguishable from the majority of cases discussing Article 4, Section 90(p) because it does not provide direct support to any specific school or school district. The Tunica County School District is

not mentioned anywhere in House Bill 1002. Stated another way, nothing in House Bill 1002 requires the County to distribute any money to the School District. The statute merely requires certain percentages of the gaming fee to be expended for "educational purposes within Tunica County" and "teacher's salary supplementation and teacher training." In addition, unlike the statute in *Pridgen*, the distributions in House Bill 1002 are not direct appropriations from the Legislature, so they do not directly conflict with the common school funding scheme established in Article 8, Section 206, which seems to have been the Court's primary concern in *Pridgen*.

¶42. Ultimately, we must return to the foundational principle that acts of the Legislature are cloaked with a strong presumption of constitutionality. *Ne. Elec. Power Ass'n*, 704 So. 2d at 65. Moreover, this Court must construe House Bill 1002 in a way that would render it constitutional, if possible. *Loden*, 279 So. 2d at 640. While there may be some doubt as to whether House Bill 1002 conflicts with Article 4, Section 90(p), doubt alone is not sufficient to render the statute unconstitutional. *Moore*, 658 So. 2d at 887. It must be proved beyond reasonable doubt that House Bill 1002 is in direct conflict with a provision of the Constitution, and we do not find that the County has met this burden.

## II. Whether the current Tunica County Board of Supervisors is bound by House Bill 1002.

¶43. "Under the common law in Mississippi, governing bodies, whether they be elected or appointed, may not bind their successors in office by contract, unless expressly authorized by law, because to do so would take away the discretionary rights and powers conferred by law upon successor governing bodies." *Ne. Mental Health-Mental Retardation Comm'n v.*

27

*Cleveland*, 187 So. 3d 601, 604 (Miss. 2016) (citations omitted).  Relying generally on this principle, the County argues that it cannot be bound by a previous Board of Supervisors' decisions to petition the Legislature to adopt House Bill 1002 and to comply with the law's distribution provisions.

¶44.    This argument is easily dismissed, because House Bill 1002 is an act of the Legislature, not the Tunica County Board of Supervisors. "[C]ities and counties are subject to legislative control, and have no actual powers which forbid legislative control of their affairs in all respects." *Gully v. Williams Bros.*, 180 So. 400, 406 (Miss. 1938).  The cases cited by the County are inapplicable to the instant case, as they address matters of contract, not legislation. *See*, *e.g.*, *Biloxi Firefighters  Ass'n v. City of Biloxi*, 810 So. 2d 589, 592 (Miss. 2002) (striking down collective-bargaining agreement between Biloxi City Council and municipal firefighters, finding that it contracted away successor administrations' right to maintain and regulate a fire department); *Tullos v. Town of Magee*, 179 So. 557, 558 (Miss. 1938) (holding that a lifetime employment contract between the Town of Magee and a water-pump operator was unenforceable as binding successor administrations). "[W]here it is optional with a county to be bound or not by a legislative act, it cannot assume to be bound by a part of the act, without at once being liable to the remaining provisions." *State v. Bd. of Supervisors of Grenada Cty.*, 105 So. 541, 546 (Miss. 1925) (quoting 15 C.J. § 53, at 420).  House Bill 1002 does not require the County to collect a 3.2 percent gaming fee from casinos operating within its borders.  But, because it has availed itself of that authority, it is bound by the attendant obligation to distribute the fee as required by law.  The County cannot disregard the language of an authorizing statute merely because it does not agree with the policy behind it.

28

### III. Whether the trial court erred in granting the Town's motion for summary judgment.

¶45. On July 4, 2015, after the hearing on the parties' competing motions for injunctive relief, the trial court issued an opinion finding that the County had failed to prove beyond a reasonable doubt that House Bill 1002 was unconstitutional and granting the defendants' requested injunctive relief. The trial court issued an order to the same effect on July 28, 2015. In response, the Town moved for summary judgment, arguing that the County's complaint should be dismissed because no dispute remained as to any of the material facts of the case. A hearing on this motion was never set. In addition, the County never responded to the motion, instead filing a notice of appeal in response to the trial court's July 28 order. On December 3, 2015, the trial court entered an order granting summary judgment to the defendants. The order indicates that the court previously had granted the Town's motion but had declined to file it in order to allow the County more time to respond. But when the County again failed to respond, the trial court reinstated its order granting summary judgment to the defendants. On appeal, the County argues that the trial court erred in granting summary judgment to the defendants, and particularly in granting summary judgment without a hearing.

¶46. The County's argument is without merit. Rule 56 of the Mississippi Rules of Civil Procedure neither explicitly nor implicitly provides the right to a hearing on a motion for summary judgment. *Adams v. Cinemark USA, Inc.*, 831 So. 2d 1156, 1162 (Miss. 2002). Motion practice is more generally governed by Rule 78, and this Court previously has held that Rule 78 does provide for the right to a hearing on a summary judgment motion. *See id.* at 1163. However, *Adams* has limited continuing application. In 2002, at the time *Adams*

29

was decided, Rule 78 provided, in part, "To expedite business, the court may make provision by rule or order for the submission and determination of motions *not seeking final judgment* without oral hearing upon brief written statements of reasons in support and opposition." ***Id.*** at 1163 (citing Miss. R. Civ. P. 78 (2002)) (emphasis added). A year after ***Adams*** was decided, Rule 78 was amended, and the above-emphasized language was removed. *See* Miss. R. Civ. P. 78. Accordingly, Rule 78 no longer supports the proposition that a trial court is precluded from ruling on a party's motion for summary judgment without holding a hearing.

¶47. But even under ***Adams***, the trial court's failure to hold a hearing on the summary judgment motion would amount only to harmless error. In ***Adams***, this Court held that the trial court's error in failing to hold an oral hearing on the defendant's summary judgment motion was harmless because the plaintiff presented no evidence which could have defeated the defendant's motion. ***Adams***, 831 So. 2d at 1164. Moreover, "[i]t is highly unlikely that any material or pertinent facts would have been disclosed at a summary judgment hearing had it been held." ***Id.*** The same is true here. The only claims raised in the County's complaint are questions of statutory and constitutional interpretation, which are pure questions of law. ***Oxford Asset Partners***, 970 So. 2d at 120. Those claims were discussed thoroughly at the hearing on the parties' motions for injunctive relief. After that hearing, the trial court issued an order finding that the County's claims lacked merit. A hearing on the Town's motion for summary judgment would have focused on the same arguments already presented by the parties and resolved by the trial court.

IV. **Whether the trial court erred in awarding attorney's fees and interest to the defendants.**

30

¶48.    In its answer to the County's complaint, the Town requested that "all costs and attorney's fees be assessed against Tunica County." In its opinion granting the Town's and School District's requests for injunctive relief, the trial court also found that the County should be assessed attorney's fees, as well as interest "on the sums which have not been properly paid to the Town of Tunica and the Tunica County School District as directed by House Bill 1002." In a subsequent order, the trial court instructed the County to remit all funds it had been withholding in violation of House Bill 1002, totaling $1,104,203.50, along with interest on that amount at a rate of eight percent per annum. The trial court again ordered the County to pay all attorney's fees for which the Town and School District had become liable due to the County's filing of the instant case, instructing the defendants to file affidavits setting forth their attorney's fees. On appeal, the County argues that the trial court erred in awarding attorney's fees and interest to the Town and the School District.

### A.    Attorney's Fees

¶49.    Mississippi follows the general rule that, in the absence of a contractual agreement or statutory authority, attorney's fees may not be awarded except in cases in which punitive damages are proper. *Grisham v. Hinton*, 490 So. 2d 1201, 1205-06 (Miss. 1986) (collecting citations). No contract exists in this case that would authorize an award of attorney's fees. We discuss the two remaining grounds for attorney's fees, statutory authority and punitive damages, below.

¶50. On appeal, the appellees[7] assert that the trial court's award of attorney's fees was authorized by statute. Specifically, they rely on the Litigation Accountability Act, which authorizes a court to impose attorney's fees on a party who has filed a frivolous claim:

> Except as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney *if* the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is *without substantial justification*, or that the action, or any claim or defense, asserted, was *interposed for delay or harassment*, or if it finds that an attorney or party unnecessarily expanded the proceedings by the other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.

Miss. Code Ann. § 11-55-5(1) (Rev. 2012) (emphasis added).[8] A claim is without substantial justification if it is "frivolous, groundless in fact or in law, or vexatious, as determined by the court." Miss. Code Ann. § 11-55-3(a).

¶51. The appellees assert that the County's lawsuit was filed without substantial justification as a tactic to delay the distributions required by House Bill 1002, which it had been paying regularly for the last twenty years. As evidence of the frivolity of the County's suit, the appellees cite the County's repeated references to the steady decline of the gaming industry in Tunica County over the past several years, a fact that is irrelevant to the constitutional issues asserted in the County's complaint. According to the appellees, the instant case was

---

[7] Because this issue is irrelevant to the constitutionality of House Bill 1002, the State did not provide an argument on this issue.

[8] Similarly, Rule 11 of the Mississippi Rules of Civil Procedure authorizes an award of attorney's fees as recourse for a frivolous filing. *See* Miss. R. Civ. P. 11(b).

filed not because the County actually believes House Bill 1002 is unconstitutional, but because it needs more money to meet its financial obligations.

¶52.    We find that the appellees' reliance on the Litigation Accountability Act is without merit. The Litigation Accountability Act requires that, "[w]hen granting an award of costs and attorney's fees, the court *shall* specifically set forth the reasons for such award and *shall* consider" a set of eleven statutory factors, "among others, in determining whether to assess attorney's fees and costs *and* the amount to be assessed." Miss. Code Ann. § 11-55-7 (emphasis added).  The trial court's opinion and order granting attorney's fees to the appellees do not provide any basis for awarding attorney's fees or a determination that the amount awarded was appropriate.  The order simply instructs the Town and the School District to file affidavits setting out their attorney's fees and directs the County to pay those amounts within fifteen days of the entry of the order.[9] Because the trial court did not make any of the findings required by Section 11-55-7, we cannot affirm its award on this basis. *See **Leaf River Forest Prods., Inc. v. Deakle***, 661 So. 2d 188, 197 (Miss. 1995) (finding that a trial court's award of attorney's fees could not be founded on the Litigation Accountability Act, because the court did not make the findings required by Section 11-55-7); ***Miss. Empl. Sec. Comm'n v. Culbertson***, 832 So. 2d 519, 531 (Miss. 2002) (reversing a trial court's award of attorney's

---

[9]   This instruction is confusing, as it requires the County to pay the appellees' attorney's fees within fifteen days of the entry of the order without giving the appellees a deadline to provide proof of their attorney's fees.  The order was entered on July 24, 2015, and filed on July 28, 2015, but the School District did not file its attorney-fee affidavit until September 22, 2015, and the Town did not file its affidavit until November 10, 2015. The Town filed an emergency motion on August 13, 2015, to compel the County to comply with the trial court's order, but as of that date neither of the appellees had provided any proof of their attorney's fees.

33

fees, where the trial court failed to "make any independent analysis as required under the Litigation Accountability Act.").

¶53.    The School District presents an additional basis on which the trial court could have granted an award of attorney's fees. While conceding that no court ever enjoined the County from making the distributions required by House Bill 1002, the School District claims that the County effectively granted itself an injunction when it stopped making distributions in 2014. Thus, the School District argues that attorney's fees were warranted in this case because the trial court essentially dissolved a wrongful injunction. In support of this argument, the School District cites Rule 65(c) of the Mississippi Rules of Civil Procedure, which requires a party seeking a preliminary injunction to pay a security bond:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum *as the court deems proper*, for the payment of such costs, damages, *and reasonable attorney's fees* as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained; provided, however, no such security shall be required of the State of Mississippi or of an officer or agency thereof, and provided further, in the discretion of the court, security may not be required in domestic relations actions.

Miss. R. Civ. P. 65(c). But the School Board's reliance on Rule 65(c) is misplaced. Rule 65(c) specifically references a court's authority to grant preliminary injunctive relief upon the payment of sufficient security. The County's failure to make the distributions required by House Bill 1002 is not analogous to an injunction.

¶54.    We now turn to the issue of punitive damages. "[P]unitive damages are not favored in the law and are to be allowed only with caution and within narrow limits." *Tideway Oil Programs, Inc. v. Serio*, 431 So. 2d 454, 460 (Miss. 1983). "Punitive damages may not be

34

awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted witch actual malice, gross negligence, which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. 11-1-65(1)(a). This Court has held that an actual award of punitive damages is not a prerequisite for an award of attorney's fees; rather, attorney's fees are warranted where "the awarding of punitive damages would have been justified," even if punitive damages are not awarded. *Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 185 (Miss. 1996). In *Holly*, the trial court denied a party's request for punitive damages but granted an award of attorney's fees. *Id.* at 184. In affirming this seemingly "inconsistent result," this Court provided the following reasoning:

> A trial judge may validly find that, although the conduct of a defendant in a given case is such that the awarding of punitive damages would be appropriate, the actual awarding of additional monetary damages above the compensatory damages would serve no purpose or otherwise be inappropriate. Nevertheless, the trial judge may also validly find that the plaintiff should not have to suffer the expense of litigation forced upon it by the defendant's conduct, and therefore determine that attorney fees should be awarded. A trial judge should be granted the flexibility to find that, although the actual awarding of punitive damages is inappropriate, the conduct of the defendant is so extreme and outrageous that he, rather than the plaintiff, should bear the expense of litigation.

*Id.* at 184-85. Critically, the question of whether punitive damages were appropriate was before the trial court in *Holly*, as a party had requested such an award. And this Court found that "the conduct of the defendants in this case was of a nature such as to make the awarding of punitive damages appropriate, even though the trial judge chose not to do so." *Id.* at 184.

¶55. Similarly, in *Pursue Energy Corp. v. Abernathy*, 77 So. 3d 1094 (Miss. 2011), the plaintiffs specifically requested an award of punitive damages, and, after a hearing on the

matter, the trial court found that the defendant's conduct could warrant punitive damages. *Id.* at 1098. However, the trial court ultimately denied the plaintiff's request for punitive damages and awarded attorney's fees instead. *Id.* This Court affirmed the trial court's award on appeal, finding no error in the chancellor's conclusion that the defendant's conduct was "willful, malicious and intentional." *Id.* at 1100. Then, relying on the above-quoted language from *Holly*, this Court found that the chancellor properly awarded attorney's fees "in lieu of punitive damages." *Id.*

¶56. More recently, in *Schwartzfager v. Saul*, 213 So. 3d 55 (Miss. 2017), this Court affirmed an award of attorney's fees in a contract dispute case in the absence of an award of punitive damages.[10] The trial court in *Saul* found that a hearing on the issue of attorney's fees was necessary due to the egregious nature of the defendant's conduct. *Id.* at 62. The parties agreed to submit the issue of attorney's fees to the trial court, and the plaintiff presented substantial evidence of his attorney's fees for the trial court's consideration. *Id.* at 67. The trial court then issued an opinion and judgment finding that the defendant's actions were egregious and intentional, "the ultimate bad faith in disrupting someone else's life for the sole purpose of benefitting his own," that the plaintiff was entitled to attorney's fees. *Id.* Based on that finding, this Court found no abuse of discretion in the trial court's decision. *Id.*

¶57. *Holly*, *Abernathy*, and *Saul* make clear that the County and School District were not required to receive an award of punitive damages to be entitled to attorney's fees. However, these cases also recognize that, where attorney's fees are being awarded in the nature of

---

[10] This Court's opinion in Saul does not reflect whether the plaintiff in that case requested punitive damages.

36

punitive damages, which otherwise are granted "only with caution and within narrow limits," *Serio*, 431 So. 2d at 460, such an award must be justified by factual determinations by the trial court. The *Holly* Court found that a trial court "should be granted the flexibility to *find* that . . . the conduct of the defendant is *so extreme and outrageous* that he, rather than the plaintiff, should bear the expense of litigation." *Holly*, 677 So. 2d at 185 (emphasis added). In line with this reasoning, the trial court in *Abernathy* found that the defendant's conduct was "willful, malicious and intentional" and granted attorney's fees to the plaintiff "in lieu of punitive damages." *Abernathy*, 77 So. 3d at 1100. Similarly, the court in *Saul* found that the defendant's actions were done in "ultimate bad faith." *Saul*, 213 So. 3d at 67. Such a finding is necessary for this Court to perform a proper review of the trial court's decision to award attorney's fees in the nature of punitive damages, and the trial court in the instant case simply failed to make any findings supporting its award of attorney's fees.

¶58.    Furthermore, even if the trial court had provided a proper legal basis for its award of attorney's fees for this Court to review, it also failed to make any findings regarding the reasonableness of the amounts awarded. An award of attorney's fees must be based on credible evidence, and the trial court must support such an award with factual determinations. *Young v. Huron Smith Oil Co., Inc.*, 564 So. 2d 36, 40 (Miss. 1990). *See also* Miss. Code Ann. § 9-1-41 (Rev. 2014) (an award of attorney's fees shall be "based on the information *already before* [the trial court] and the court's own opinion based on experience and observation."). Rule 1.5 of the Mississippi Rules of Professional Conduct sets forth a list of

37

eight factors, also known as the *McKee* factors,[11] to be considered in determining the reasonableness of an attorney's fee. Miss. R. of Prof'l Conduct 1.5(a). This Court has mandated that a trial court consider these factors, and we have not hesitated to vacate an award of attorney's fees when the trial court fails to do so. *See BellSouth Pers. Commc'n, LLC v. Bd. of Supervisors of Hinds Cty.*, 912 So. 2d 436, 448 (Miss. 2005); *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 487 (Miss. 2002); *Browder v. Williams*, 765 So. 2d 1281, 1288 (Miss. 2000). "[T]rial court judges must follow the appropriate procedure and make the requisite findings of fact necessary to insure a losing litigant is only made to compensate his adversary for fees and expenses which were reasonably incurred." *BellSouth*, 912 So. 2d at 448.

¶59. In this case, the trial court awarded attorney's fees to the appellees without receiving any evidence in support of those fees or making any determination as to the reasonableness of the amounts requested. The affidavit filed by the School District indicates that it expended $14,176 defending the County's lawsuit, while the Town's affidavit declares that it expended $158,712 in the same time frame. These affidavits were filed months after the trial court entered its order awarding attorney's fees, and nothing in the record suggests that the trial court ever reviewed these requests. Simply put, the trial court failed to make the factual determinations necessary to support its award of attorney's fees, as this Court has required.

¶60. Because the trial court made no specific findings concerning the appropriateness of an award of attorney's fees or the amount of that award, we must find that the trial court abused

---

[11] *See McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

its discretion in awarding attorney's fees to the Town and the School District. Accordingly, we vacate the trial court's award of attorney's fees and remand this case to the trial court for further consideration consistent with this opinion.

### B. Interest

¶61. As an initial matter, we note that the County has not offered any arguments or cited any authority in either of its briefs on this issue. Accordingly, this issue is procedurally barred. *Boutwell*, 829 So. 2d at 1223. Notwithstanding the procedural bar, Section 75-17-7 of the Mississippi Code provides that judgments other than those founded on a sale or contract "shall bear interest at a per annum rate set by the judge hearing the complaint from the date determined by such judge to be fair but in no event prior to the filing of the complaint." Miss. Code Ann. § 75-17-7 (Rev. 2016). In *City of Jackson v. Williamson*, 740 So. 2d 818, 822 (Miss. 1999) (plurality opinion), this Court held that the State and its political subdivisions may be assessed post-judgment interest on money judgments, absent an explicit statutory exception. *See also Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1094 (Miss. 2000) (affirming the plurality opinion in *Williamson*). Because the County has failed to provide a specific statutory exception, we find that the trial court did not err in awarding post-judgment interest on the funds the County had withheld wrongfully from the defendants.

### CONCLUSION

¶62. For the foregoing reasons, we affirm the trial court's grant of summary judgment and award of interest. But we vacate the trial court's award of attorney's fees and remand this

39

case to the trial court for a determination of whether a legal basis for an award of attorney's fees exists and, if so, whether the amounts requested are reasonable.

¶63. **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

**RANDOLPH, P.J., KITCHENS, KING, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

> It is always a source of regret to me to be unable to concur in the conclusion reached by a majority of my Associates in the decision of any case, which regret is here more pronounced than usual for the reason that the construction placed by the majority of my Associates on the section of the Constitution here in question confers upon the Legislature the unlimited power to support the public schools which I think it should have, but to so concur would cause me to violate what seems to me the plain language of the Constitution, as well as some of the most elementary rules for the construction of written instruments.[12]

¶64. The sentiment of Chief Justice Smith's words penned in 1923 still rings true. In every challenge to a statute's constitutionality, the legislative enactment arrives clothed in a presumption of validity;[13] and only in rare cases where we find it unconstitutional beyond a reasonable doubt, will we strike it down.[14] This protective language provides comfortable refuge, particularly when we are asked to strike down a statute serving an important public

---

[12] *Miller v. State*, 130 Miss. 564, 94 So. 706, 710 (1923) (Smith, C.J., dissenting).

[13] *State ex rel. Hood v. Louisville Tire Ctr., Inc.*, 55 So. 3d 1068, 1072 (Miss. 2011) (citing *Fulgham v. State*, 47 So. 3d 698, 701 (Miss. 2010)).

[14] *Louisville Tire Ctr., Inc.*, 55 So. 3d at 1072 (citing *Richmond v. City of Corinth*, 816 So. 2d 373, 377 (Miss. 2002) (citing *Jones v. State*, 710 So. 2d 870, 877 (Miss. 1998))).

interest. But, as Chief Justice Smith expressed nearly a century ago, our duty binds us to interpret the Constitution faithfully by its text.[15]

¶65. Here, Article 4, Section 90(p) of the Mississippi Constitution is susceptible to a single reasonable interpretation: It prohibits the Legislature from enacting local laws that make funds available for private and public primary schools.[16] House Bill 1002, clearly a local law, earmarks fourteen percent of a 3.2 percent fee on gross gaming revenue in Tunica County—and only in Tunica County—for educational purposes and teacher salaries in Tunica County—and only in Tunica County.[17]

¶66. I leave it to others to debate whether it is wise policy to fund education in Tunica County with tax revenues from casinos in Tunica County. But the Constitution forbids local laws—such as the one at issue here—from making funds available for public primary schools. And this one does exactly that. Because this portion of House Bill 1002 violates Article 4, Section 90(p) of the Mississippi Constitution, I concur in part and dissent in part.

¶67. Article 4, Section 90(p) states:

> The Legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz.:
>
> . . .

---

[15] *Hughes v. Hosemann*, 68 So. 3d 1260, 1275 (Miss. 2011) (citing *State ex rel. Moore v. Molpus*, 578 So. 2d 624, 639 (Miss. 1991) ("constitutional interpretation by this Court is tied to the text of our constitution").

[16] Miss. Const. art. 4, § 90(p).

[17] 2004 Miss. Private and Local Laws ch. 920.

(p)     Providing for the management or support of any private or common school, incorporating the same, or granting such school any privileges.[18]

¶68.    The provision's purpose seems clear to me. In adopting our Constitution, our citizens wanted to ensure that statutes providing funding for schools, whether public or private, applied the same to all counties and all school children, thereby removing from the Legislature's prerogative the ability to enact legislation that favored the school children of a particular county, or group of counties.

¶69.    Said another way, Article 4, Section 90 imposes a categorical bar on local, private, or special laws for certain enumerated matters, including the support of private or public schools. A local law is "[a] statute that relates to or operates in a particular locality rather than the entire state."[19] House Bill 1002 clearly is a local law because, by its terms, it is limited to one particular county—Tunica County.[20] And because House Bill 1002 is a local law, it violates Article 4, Section 90.

¶70.    Article 4, Section 90(p) prohibits local laws "[p]roviding for the management or support of any private or common school, incorporating the same, or granting such school any privileges."[21] This Court has applied Article 4, Section 90(p) in several cases. Some

---

[18] Miss. Const. art. 4, § 90(p).

[19] *Local Law*, Black's Law Dictionary 803 (abr. 9th ed.).

[20] Compare **Hewes v. Langford**, 105 Miss. 375, 62 So. 358, 359–60 (1913) ("Chapter 288 of the Laws of 1912, by its terms, is confined in its operation to Harrison county alone. Without disguise, it is a local law."), *with* **Miller**, 94 So. at 710 ("the appropriation is a general law, is not class legislation, nor a local or special law, since the funds are to equalize public school terms throughout the state by a fair and equitable distribution, and may be used for any school district in any county, or for all of them.").

[21] Miss. Const. art. 4, § 90(p).

concerned Article 4, Section 90(p)'s latter two prohibitions: "incorporating the same" and "granting such school any privileges."[22]  Those are not at issue here.

¶71.    Instead, this case concerns Article 4, Section 90(p)'s prohibition of local laws "[p]roviding for the . . . support of any private or common school."[23]  This prohibition consists of three basic elements: (1) the act the statute may not do—"[p]rovid[e] for"—(2) the thing the statute may not provide—"support"—and (3) the entity the statute may not provide support for—"any private or common school."

¶72.    In three cases, this Court has struck down local laws for "[p]roviding for the . . . support of any private or common school."[24]  In *State Board of Education v. Pridgen*, an individual lodged an Article 4, Section 90(p) challenge against a statute that appropriated $5,000 for a supplemental school fund available "'when any county in the state, administering its schools on the present basis of state aid, shall have exhausted all money appropriated by the state for common school purposes, and whose schools cannot run for the constitutional period of four months.'"[25]  This Court found that the statute violated Article 4, Section 90(p), reasoning:

---

[22] *See* ***Williamson v. Howell***, 155 Miss. 220, 124 So. 319, 321 (1929) (addressing Article 4, Section 90(p)'s prohibition of special or local laws granting schools privileges); ***Hewes***, 62 So. at 359–60 (addressing Article 4, Section 90(p)'s prohibitions of special or local laws granting schools privileges and incorporating schools).

[23] Miss. Const. art. 4, § 90(p).

[24] ***Hamilton v. Bd. of Supervisors of Lafayette Cty.***, 133 Miss. 14, 96 So. 465 (1923); ***Scarbrough v. McAdams Consol. Sch. Dist.***, 124 Miss. 844, 87 So. 140 (1921); ***State Bd. of Educ. v. Pridgen***, 106 Miss. 219, 63 So. 416 (1913).

[25] ***Pridgen***, 63 So. at 417.

43

It seems to be the theory that the Legislature, by labeling the common school fund "supplemental," thereby changed the nature of the appropriation, and in so doing they provided a remedy for a condition entirely outside of the scheme marked out by the organic law. If this is the theory upon which the validity of the law must stand, it would seem that the law in question is a special law, providing for the support of a class of common schools in certain localities of the state, and is condemned by paragraph "p" of section 90 of the Constitution. It is certain that the Legislature could not pass a law providing for the support of any common school eo nomine, or for any selected number of common schools. Chapter 5 of the Laws of 1912 is a law providing for the support of a class of common schools. The schools of certain counties provided for by the law are separated from and placed in a different class from the schools located in the other counties, and by this simple expedient they are given special privileges, and are accorded additional support not enjoyed by the schools located in other counties of the state, and it seems this law is undisguisedly a special law to fit local conditions.[26]

¶73.    That statute made funds available for indeterminate schools and districts: those which had exhausted the funds otherwise appropriated to them.  It also left open the possibility the funds would never actually reach a school or district: *i.e.*, if no school or district actually exhausted the funds otherwise appropriated.  But, according to this Court, the statute was a special law "providing for the support of a class of common schools."[27]

¶74.    In *Scarbrough v. McAdams Consolidated School District*, this Court struck down a statute "'authorizing the board of supervisors of Attala county, Mississippi, to issue bonds for the purpose of building and equipping an agricultural high school in the McAdams consolidated school district.'"[28]  The Court found "[t]his was a special act, and we are

---

[26] *Id.* at 418.

[27] *Id.*

[28] *Scarbrough*, 87 So. at 141.

convinced that it provided for the support of the single school district."[29] This was so even though the statute itself appropriated no funds, instead authorizing the Attala County Board of Supervisors to issue bonds. The same was true in **Hamilton v. Board of Supervisors of Lafayette County**, except in that case the Legislature enacted the statute approving the bonds after they already had been issued.[30]

¶75. And in **Turner v. City of Hattiesburg**, we rejected an Article 4, Section 90(p) claim against a statute authorizing bonds to fund Mississippi Normal College because "[t]his college [was] neither a private nor a common school."[31] Instead, it was "a college established for the purpose of enabling the state to equip its teachers for service in its common schools."[32]

¶76. These decisions shed some light on the meaning of the three elements in this Article 4, Section 90(p) prohibition: "[p]roviding for," "support," and "any private or common school." Support includes monetary support.[33] Common school refers to K-12 public primary

---

[29] **Id.**

[30] **Hamilton**, 96 So. at 466.

[31] **Turner v. City of Hattiesburg**, 98 Miss. 337, 53 So. 681, 683 (1910).

[32] **Id.**

[33] *See* **Pridgen**, 63 So. at 417 (finding that an appropriation from the Legislature is support within the meaning of Article 4, Section 90(p)); **Scarbrough**, 87 So. at 141 (finding that statute authorizing bond issuance provides support within the meaning of Article 4, Section 90(p)).

education.[34]  Yet this Court has never, in an Article 4, Section 90(p) case, engaged in an extensive discussion of what it means to provide for.  And this case turns on that meaning.

¶77.  Here, House Bill 1002 certainly involves monetary support: it earmarks fourteen percent of a 3.2 percent fee on gross gaming revenue for educational purposes and teacher salary supplementation.[35]  The question is whether that support is provided for a common school.

¶78.  The American Heritage Dictionary defines "provide" as "a. To make available (something needed or desired); furnish: provide food and shelter for a family. b.  To supply something needed or desired to: provided her family with food."[36]  Other courts have concluded that "to make available" represents the core meaning of the word "provide" when interpreting legal texts.[37]

¶79.  One case in particular provides an instructive analysis.  In *Great Expectations Creative Management, Inc. v. Attorney General of the State of New York*, a videotape dating service sought a declaratory judgment that it would not be subject to certain regulatory statutes if it

---

[34] *Compare **Scarbrough***, 87 So. at 141 (finding Article 4, Section 90(p) violation with statute that benefits a public high school), *with **Turner***, 53 So. at 683 (finding that a state college is not a common school within the meaning of Article 4, Section 90(p)).

[35] 2004 Miss. Private and Local Laws ch. 920.

[36] *Provide*, American Heritage Dictionary of the English Language (5th ed. 2017).

[37] **Land and Marine Devs., Inc. v. Widvey**, 546 N.W.2d 380, 382 (S.D. 1996) (citing Webster's New World Dictionary 481 (rev. pocket ed. 1975) ("The plain and ordinary meaning of the word 'provide' is, 'to make available; supply . . . to furnish with[.]'")); **Great Expectations Creative Mgmt., Inc. v. Att'y Gen. of the State of N.Y.**, 616 N.Y.S.2d 917, 919–20 (N.Y. Sup. Ct. 1994) (citing American Heritage Dictionary of the English Language (3d ed. 1992)) ("The plain dictionary definition of the verb 'provide' is 'to furnish, to supply or to make available.'").

began conducting business in New York.[38] In 1971, the New York Legislature had enacted the regulatory statutes in question which placed "limitations on contracts involving social referral services, limit[ed] the fee that can be charged, requir[ed] that a minimum number of referrals be provided, and call[ed] for the confidentiality of any personal information given."[39]

¶80. The statutes applied to any "social referral service."[40] And the statute stated "'the term "social referral service" shall include any service for a fee *providing* matching of members of the opposite sex, by use of computer or any other means, for the purposes of dating and general social contact.'"[41]

¶81. Great Expectations argued it was not subject to these statutes because it was not a "social referral service."[42] It argued it was not a "social referral service" because the statutes applied only to entities "providing matching" and "it allows people to meet each other as a matter of their own volition. In other words, it claims to be merely the facilitator rather than a provider of member-matching services. The claim is that the members, and not the organization, make the match."[43]

¶82. The judge disagreed:

---

[38] *Great Expectations Creative Mgmt., Inc.*, 616 N.Y.S.2d at 918.

[39] *Id.*

[40] *Id.* at 919.

[41] *Id.* (emphasis added).

[42] *Id.*

[43] *Id.*

The court cannot agree with that position. It is clear that the scope of the statute is not limited to service agencies which actively match individuals, but encompasses those services for a fee "providing matching of members of the opposite sex, by use of computer or any other means." The plain dictionary definition of the verb "provide" is "to furnish, to supply or to make available." (American Heritage Dictionary of English Language [3d ed. 1992].) "Referral" means "directing to a source for information" or "to direct one's attention to" (*id.*). Clearly then, the plain language of the statute is not limited only to services that actually do the matching, but includes those agencies which make available the means for persons to do their own matching.[44]

¶83. Said differently, Great Expectations believed it did not provide matchmaking services because it never ensured a match occurred. Instead, it merely made resources available so individuals could match themselves. But the judge correctly recognized that "provide" does not mean to mandate or to ensure, but to make available. The mere fact that Great Expectations made resources available for matchmaking meant it provided matchmaking service regardless of whether any matchmaking ever occurred.

¶84. This reasoning should control our decision in this case. The majority concludes that House Bill 1002 does not provide support for a common school because it does not mandate that the Tunica Board of Supervisors actually give the fourteen percent earmarked for educational purposes and teacher salary supplementation to the Tunica County School District. But it does provide the funds and make them available. Like Great Expectations, House Bill 1002 does not actually make a match. But House Bill 1002 indisputably makes funds available. What the Board of Supervisors may or may not do does not change what the

---

[44] *Id.* at 919–20.

48

Legislature did when it made fourteen percent of the gaming fee available for that use.[45]
Because Article 4, Section 90(p) prohibits local laws providing for support, and because
"providing" simply means to make available, House Bill 1002 does what it cannot do.

¶85.    Furthermore, the majority's argument has been rejected by this Court in **Scarbrough**.
There, we struck down, under Article 4, Section 90(p), a statute which merely "'authoriz[ed]
the board of supervisors of Attala county, Mississippi, to issue bonds for the purpose of
building and equipping an agricultural high school in the McAdams consolidated school
district.'"[46] That statute did not mandate that any funds reach a particular school or district
because it did not require the board to issue the bonds.    Instead, it made the
support—bonds—available.  The same is true here.  The statute makes funds available, but
the Board ultimately must decide whether they reach a common school.

¶86.    The provisions of House Bill 1002 that earmark fourteen percent of the gross gaming
revenue for educational purposes and teacher-salary supplementation violate Article 4,
Section 90(p) because this local law "[p]rovid[es] for the . . . support of . . . [a] common
school."[47]  So I must dissent from that portion of the majority's opinion.

   **COLEMAN, J., JOINS THIS OPINION**.

---

   [45] And even were this not the case, it strains credulity to suggest that a particular
county's board of supervisors will comply with the statutory mandate to spend money for
educational purposes and teacher salary supplementation in that county without in some way
supporting that county's school district.

   [46] **Scarbrough**, 87 So. at 141.

   [47] Miss. Const. art. 4, § 90(p).